600 S.E.2d 321

**James W. KESSEL, M.D., Richard M. Vaglienti, M.D., and Stanford J. Huber, M.D., Plaintiffs**

v.

**MONONGALIA COUNTY GENERAL HOSPITAL COMPANY, DBA Monongalia General Hospital, a West Virginia Nonprofit Corporation; Mark Bennett, M.D., Individually; Bennett Anesthesia Consultants, PLLC; and Professional Anesthesia Services, Inc., Defendants.**

Nos. 31547, 31548.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 10, 2004.

Decided May 19, 2004.

Frank E. Simmerman, Jr., Esq., Simmerman Law Office, PLLC, Clarksburg, West Virginia, Attorney for Dr. Kessel.

C. Michael Bee, Esq., Susan B. Tucker, Esq., Hill, Peterson, Carper, Bee & Deitzler, PLLC, Charleston, West Virginia, Attorneys for Drs. Vaglienti and Huber.

Gordon H. Copland, Esq., Steptoe & Johnson, PLLC, Clarksburg, West Virginia, Attorney for Monongalia General Hospital.

Thomas A. Heywood, Esq., Bowles Rice McDavid Graff & Love, PLLC, Attorney for Amicus Curiae, West Virginia Hospital Association.

MAYNARD, Chief Justice:

We are called upon to answer a certified question from the Circuit Court of Monongalia County. In the exercise of our discretion,

we reformulate the certified question as follows:[1]

> May a public or quasi-public hospital enter into an exclusive contract with a medical service provider that has the effect of completely excluding physicians who have staff privileges at the hospital from the use of the hospital's medical facilities.[2]

For the reasons that follow, we answer the question in the negative.[3]

## I.

## FACTS

The plaintiffs below, Dr. James W. Kessel, Dr. Richard M. Vaglienti, and Dr. Stanford J. Huber, are anesthesiologists who have been granted staff privileges[4] at defendant Monongalia General Hospital (hereafter "Monongalia General" or "the hospital"), a 207–bed acute facility which provides surgical services to patients. The plaintiffs were employees and shareholders of Monongalia Anesthesia Associates, Inc. (hereafter "MAA") which originally entered into a contract with Monongalia General in 1975 for the provision of anesthesia services. This contract extended indefinitely, with a termination clause upon sufficient advance notice.

In 1987, Monongalia General entered into an exclusive contract with another medical service provider to provide cardiac anesthesia services. At that time, MAA remained the primary provider of all other types of anesthesia services. In 1989, contract negotiations between the hospital and MAA failed to produce an extension of the contract, apparently due in part to the hospital's desire

to add a contractual provision that tied staff privileges of MAA anesthesiologists to the exclusive contract. As a result, MAA continued to provide the primary non-cardiac anesthesia services for the hospital for approximately the next decade without a contract.

In 1999, Monongalia General entered into an agreement with Dr. Mark Bennett and Bennett Anesthesia Consultants, PLLC, defendants below, to exclusively provide all anesthesia services for orthopedic patients at the hospital. Thereafter, the hospital sought a provider for all, save cardiac and orthopedic, general anesthesia services.

At that point, MAA asserted that such actions constituted a reduction in privileges previously granted to its physicians for reasons unrelated to clinical competency in violation of the medical staff bylaws. A hearing was held before the Fair Hearing Panel as provided in the bylaws.[5] The Panel recommended, *inter alia,* approval of contracting for anesthesiology services, since the privileges of MAA doctors had not been compromised. MAA appealed the recommendations to the Hospital Board of Directors which essentially accepted the recommendations.

Thereafter, the hospital entered into a contract with Professional Anesthesia Services, Inc., which granted it the exclusive right to provide all other general anesthesia services at the hospital, with the exception of cardiac and orthopedic surgery patients. As a result, even though the plaintiffs maintain privileges at the hospital, they no longer are permitted to provide operative and orthopedic anesthesia in the hospital.[6]

---

1. In Syllabus Point 3 of *Kincaid v. Mangum,* 189 W.Va. 404, 432 S.E.2d 74 (1993), we held, in part, that "[w]hen a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it[.]"

2. The circuit court asked whether Monongalia County General Hospital can "enter into exclusive contracts with service providers if the effect of the exclusive contracts are adverse to other physicians who have staff privileges at the hospital," and answered the certified question in the affirmative.

3. At the outset, we note the valuable contribution of The West Virginia Hospital Association which

filed an *amicus curiae* brief in support of Monongalia General Hospital.

4. According to the plaintiffs, surgeons, anesthesiologists, and nurse anesthetists are not hospital employees, but rather have staff privileges. In contrast, surgical nurses and operating room technicians are hospital employees.

5. Monongalia General initially denied the plaintiffs' hearing requests on the basis that the matter was outside the bylaws' fair hearing provisions, but ultimately agreed to a hearing without waiving its original position.

6. Drs. Huber and Vaglienti, however, remain active in the hospital's pain management practice.

The plaintiffs subsequently sued the Hospital, Dr. Bennett, Bennett Anesthesia Consultants, and Professional Anesthesia Services alleging tortious interference with business relationships; due process violation/failure to provide a fair hearing; restraint of trade; breach of contract; and breach of covenants of good faith and fair dealing. The hospital sought summary judgment on every count but the alleged antitrust violation. The circuit court, finding the matter was controlled by a question not yet addressed by this Court, certified the question, set forth above, as dispositive of the hospital's motion for summary judgment.

## II.

## STANDARD OF REVIEW

■ "The appellate standard of review of questions of law answered and certified by a circuit court is *de novo*." Syllabus Point 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996).

## III.

## DISCUSSION

■ The plaintiffs argue, first, that Monongalia General's medical staff bylaws constitute a contract between the plaintiffs and the hospital which the hospital breached. We disagree. "The fundamentals of a legal 'contract' are competent parties, legal subject-matter, valuable consideration, and mutual assent. There can be no contract, if there is one of these essential elements upon which the minds of the parties are not in agreement." Syllabus Point 5, *Virginian Export Coal Co. v. Rowland Land Co.*, 100 W.Va. 559, 131 S.E. 253 (1926). In the instant case, the essential element of valuable consideration is absent. This Court has held that "[t]he doing by one of that which he is already legally bound to do is not a valuable

consideration for a promise made to him, since it gives to the promisor nothing more than that to which the latter is already entitled." Syllabus Point 2, *Thomas v. Mott*, 74 W.Va. 493, 82 S.E. 325 [1914]." Pursuant to 64 C.S.R. § 12–7.2.1.1 and 7.2.1.1.2 (July 1, 1994), concerning hospital licensure, "[t]he governing authority [of a hospital] shall adopt and amend bylaws which require it to . . . [a]pprove the bylaws and regulations of the medical staff[.]" In addition, pursuant to 64 C.S.R. § 12–14.1.4, "[t]he medical staff shall initiate and, with the approval of the governing board of the hospital, adopt rules, bylaws and regulations governing its professional organization and functional work." Because the hospital was already bound by law to approve the bylaws of the medical staff, and the medical staff was bound to initiate and adopt bylaws, neither party conferred on the other any more than what the law already required. Thus, we conclude that the medical staff bylaws do not constitute a contract. *See Gianetti v. Norwalk Hosp.*, 211 Conn. 51, 557 A.2d 1249 (1989) (ruling that medical staff bylaws, by themselves, do not constitute enforceable contract between hospital and medical staff because hospital board had legal duty to adopt bylaws); *Virmani v. Presbyterian Health Services*, 127 N.C.App. 71, 488 S.E.2d 284 (1997) (finding that mere enactment of a set of bylaws pursuant to a statute is a preexisting duty and cannot itself constitute consideration for the formation of a contract); *O'Byrne v. Santa Monica–UCLA Medical Center*, 94 Cal.App.4th 797, 114 Cal.Rptr.2d 575 (Cal.Ct.App.2001) (determining that there was no consideration given for bylaws where hospital had a statutory duty to appoint medical staff, and medical staff had a statutory duty to adopt bylaws and abide by them).[7]

■ The plaintiffs assert, however, that even if this Court determines that the staff bylaws are not an enforceable contract, we

7. There is a split of authority on the issue of whether medical staff bylaws constitute a contract. While it appears that the majority of jurisdictions hold that such bylaws do constitute an enforceable contract, most of these courts apply little, if any contract law analysis. *See Janda v. Madera Community Hosp.*, 16 F.Supp.2d 1181

(E.D.Cal.1998). This Court has recognized that hospitals are bound to follow fair hearing procedures expressly set forth in bylaws in peer review cases. *See Mahmoodian v. United Hosp. Center, Inc.*, 185 W.Va. 59, 404 S.E.2d 750 (1991), and discussion *infra*.

must nevertheless find that the bylaws control the relationship between the plaintiffs and Monongalia General. Again, we disagree. Several courts have held, and we agree, that generally fair hearing and due process provisions in a hospital's medical staff bylaws are not implicated unless there are allegations against a physician bearing on professional competency and conduct. *See Van Valkenburg v. Paracelsus Healthcare*, 606 N.W.2d 908, 917 (N.D.2000) (stating that "[m]ajority of courts ... have held hearing and due process provisions in similar medical staff bylaws are not implicated unless there are allegations against a physician bearing on professional competency and conduct" (citations omitted)); *Engelstad v. Virginia Mun. Hosp.*, 718 F.2d 262, 267 (8th Cir.1983) (finding that "staff privileges serve to delimit a doctor's authority to practice in the hospital based upon the doctor's overall competence in his particular field(s) of practice. Staff privileges do not establish an employment contract with the hospital"); *Dutta v. St. Francis Reg. Med. Center*, 254 Kan. 690, 867 P.2d 1057 (1994) (holding that radiologist was not entitled to hearing upon revocation of access to radiology facilities in connection with hospital's entry into exclusive contract with another radiologist because hospital's managerial decision was based on business considerations and not allegations of unprofessional conduct); *Gonzalez v. San Jacinto Methodist Hosp.*, 880 S.W.2d 436 (Tex.Ct. App.1994) (concluding that fair hearing procedures in medical staff bylaws were not intended to cover cases in which a doctor's staff privileges have been affected by some administrative decision not directly involving that doctor). In other words, medical staff bylaws generally are intended to require fair proceedings when an individual practitioner is alleged to be substandard in skill and are not intended to apply to hospital board management decisions.[8] The parties herein agree that this is not a peer review case, and there have been no allegations of professional incompetence against the plaintiffs. Therefore, we hold that, absent express language to the contrary, a hospital's medical staff bylaws do not constitute a contract between the hospital and its staff physicians. However, where it is alleged that a physician is guilty of professional incompetence or misconduct, the hospital is bound by the fair hearing procedural provisions contained in the medical staff bylaws.[9]

Next, the plaintiffs contend that Monongalia General violated their constitutional due process rights by terminating their staff privileges without cause. In Dr. Kessel's brief to this Court, he states that his "right to practice his profession, as he had for nearly a quarter of a century, at the facility (and in the community) where he had long-established relationships with physicians and patients, certainly meets the definition of a property interest."

In addressing this issue, "we shall assume *arguendo*, that [Monongalia General] is a public agency for our purposes here and analyze the case before us from that point of view." *Orteza v. Monongalia County General Hosp.*, 173 W.Va. 461, 466, 318 S.E.2d 40, 45 (1984) (footnote omitted). The Fourteenth Amendment of the Federal Constitution provides, in part, that the State may not "deprive any person of life, liberty, or property, without due process of law[.]" "The Due Process Clause, Article III, Section 10 of the West Virginia Constitution, requires procedural safeguards against State action which affects a liberty or property interest." Syllabus Point 1, *Waite v. Civil Service Commission*, 161 W.Va. 154, 241 S.E.2d 164 (1977). "The threshold question in any claim of due process deprivation is isolation of the

---

8. This determination is consistent with language in Monongalia General's medical staff bylaws that provides that the overall responsibility for the management and control of the hospital rests with the board of directors, and that the board of directors' charter, bylaws, rules, and regulations take precedence and prevail over the bylaws. It is also consistent with our Code of State Rules which provides that a hospital's governing body is responsible for the management and control of the entire hospital, while the medical staff is responsible for the quality of medical care. 64 C.S.R. § 12–7.2.1 (July 1, 1994).

9. *See Mahmoodian v. United Hospital Center, Inc., supra* (finding that the scope of judicial review of health care peer review decisions affecting the privileges of a medical staff member is essentially the same for private and public hospitals.).

property interest ... that the plaintiff alleges was at stake." *Orteza,* 173 W.Va. at 466–67, 318 S.E.2d at 45. This Court has held that "[a] 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." Syllabus Point 3, *Waite, supra.* However,

> To have a property interest, an individual must demonstrate more than an abstract need or desire for it. He must instead have a legitimate claim of entitlement to it under state or federal law. Additionally, the protected property interest is present only when the individual has a *reasonable* expectation of entitlement deriving from the independent source.

Syllabus Point 6, *State ex rel. Anstey v. Davis,* 203 W.Va. 538, 509 S.E.2d 579 (1998). We also have recognized that "a 'property' interest protected by due process must derive from a private contract or state law.[.]" *Major v. DeFrench,* 169 W.Va. 241, 251, 286 S.E.2d 688, 695 (1982) (citations omitted). However, a property interest "must be more than a unilateral expectation of continued employment." *Id.*[10]

■ Having determined herein that the medical staff bylaws do not constitute a contract between a hospital and its staff physicians, it follows that the plaintiffs' alleged property right cannot derive from a private contract. Also, we are not aware of any state or federal law that grants to hospital staff physicians a property right in their staff privileges. Instead, the plaintiffs appear to reason that because they have practiced at the hospital for a number of years, they have a right to continue to do so. This, however, amounts to no more than a unilateral expec-

tation of continued employment which we have rejected as a sufficient basis for a property interest. Finally, this Court has previously stated that "a physician does not have a constitutional or any vested right to membership on a hospital staff." *State ex rel. Sams v. Ohio Valley General Hospital Association,* 149 W.Va. 229, 238, 140 S.E.2d 457, 463 (1965). Accordingly, we conclude that the plaintiffs' assertion of a property right protected by due process must fail.[11] *See also Capili v. Shott,* 487 F.Supp. 710, 713 (S.D.W.Va.1978), *affirmed by* 620 F.2d 438 (4th Cir.1980) (concluding as a matter of law that "[a] physician ... has no constitutional right to staff privileges at a public hospital ... merely because he is licensed to practice medicine." (Citations omitted)).

■ This, however, is not the end of our analysis. Rather, we believe that this Court's precedent concerning physicians' staff privileges is controlling. Traditionally, we have distinguished between private and public hospitals in determining the scope of our review of hospital decisions affecting staff privileges. *See also Rao v. Auburn General Hospital,* 10 Wash.App. 361, 365, 517 P.2d 240, 243 (1973) (providing that "[g]enerally, courts have drawn a distinction between private and public hospitals in considering the extent to which courts may review the exclusion of a physician from staff privileges."). In *State ex rel. Bronaugh v. City of Parkersburg,* 148 W.Va. 568, 136 S.E.2d 783 (1964), a physician asked this Court to compel the Board of Trustees of Camden–Clark Memorial Hospital, a public hospital, either to grant the physician's application for staff membership in and use of the facilities of Camden–Clark or give him notice

---

**10.** In support of their constitutional claim, the plaintiffs cite Syllabus Point 6 of *Garrison v. Herbert J. Thomas Mem. Hosp.,* 190 W.Va. 214, 438 S.E.2d 6 (1993), in which we held that,

> An individual's right to conduct a business or pursue an occupation is a property right. The type of injury alleged in an action for tortious interference is damage to one's business or occupation. Therefore, the two-year statute of limitations governing actions for damage to property, set forth under *W.Va. Code,* 55–2–12 [1959], applies to an action for

tortious interference with business relationship.

We find that *Garrison* is inapposite to the instant case inasmuch as *Garrison* involved an allegation of substandard medical care which affected a physician's ability to obtain employment at other hospitals.

**11.** The plaintiffs also make an argument based on tortious interference. We do not find it necessary to address this argument in order to answer the certified question.

and a hearing on his application. In discussing the matter, this Court noted that

> The authorities are almost unanimous in holding that private hospitals, in the exercise of their discretion, have the right to exclude licensed physicians from the use of their facilities. Public hospitals, however, are not entitled to that immunity. A regularly licensed physician and surgeon has a right to practice in the public hospitals of the state so long as he stays within the law and conforms to all reasonable rules and regulations of the institutions.

*Bronaugh*, 148 W.Va. at 572, 136 S.E.2d at 786 (citations omitted). The Court held in Syllabus Point 1 of *Bronaugh*,

> A regularly licensed physician and surgeon who has conformed to the law and to all reasonable rules and regulations of a public hospital has a right to become a member of the staff thereof and, in the event such right is denied, he shall be afforded an opportunity to be heard and to offer his defense to any charges upon which such denial is based.

Therefore, the Court granted the physician's petition for a writ of mandamus to compel Camden–Clark to grant him a hearing on his application for staff privileges. The holding in *Bronaugh* is consistent with the general rule set forth in 40A Am.Jur.2d, *Hospitals and Asylums* § 19 (1999), and we now hold that "[a] physician . . . is entitled to practice in the public hospitals of [the] state so long as he or she stays within the law and conforms to all the reasonable rules and regulations of the hospitals. He or she cannot be deprived of that privilege by rules, regulations, or acts of the hospital's governing authorities that are unreasonable, arbitrary, capricious, or discriminatory." (Footnotes omitted).

In contrast to *Bronaugh*, the case of *State ex rel. Sams v. Ohio Valley General Hospital Association*, 149 W.Va. 229, 140 S.E.2d 457 (1965), concerned the issue whether a *private* hospital has authority to exclude, in its discretion, members of the medical profession from membership on its staff. The petitioner, Dr. Sams, a physician and surgeon licensed to practice medicine, applied for appointment to the medical staff of the respondent, Ohio Valley General Hospital Association, but was summarily denied. Dr. Sams then sought a writ of mandamus from this Court compelling Ohio Valley General to appoint him to its medical staff or, in the alternative, to afford him a hearing on his application. This Court first determined that "the controlling question here is whether the respondent hospital is a private or a public hospital[,]" 149 W.Va. at 232, 140 S.E.2d at 459, and found Ohio Valley General to be a private hospital. The Court then looked to its language in *State ex rel. Bronaugh, supra*, concerning the right of private hospitals to exclude licensed physicians from the use of their facilities. Concluding that Dr. Sams failed to establish a clear legal right to the requested relief, the Court explained:

> It is well settled by the great weight of authority and, in fact, is readily admitted by the petitioner, that a physician does not have a constitutional or any vested right to membership on a hospital staff. When the hospital involved is determined to be a public institution, a physician applicant to the medical staff is entitled to membership thereon or to a hearing of the reasons for the refusal of his application. If upon hearing it is found that the governing authorities have acted arbitrarily, capriciously or unreasonably, mandamus may lie. This right does not exist, however, in relation to a private hospital, which may, in its discretion, exclude any physician from its staff without being required to give any reason therefor.

149 W.Va. at 238, 140 S.E.2d at 463. Accordingly, the Court held in Syllabus Point 4 of *Sams* that "[t]he governing authorities of a private hospital, in the exercise of their discretion, have the absolute right to exclude licensed physicians from its medical staff and such action is not subject to judicial review." *See also* 40A Am.Jur.2d, *Hospitals and Asylums* § 20 (1999) (stating that "[p]rivate hospitals have the right to exclude licensed physicians from the use of their facilities, and such exclusion rests within the sound discretion of the hospital's managing authorities." (footnotes omitted)); *Peterson v. Tucson General Hosp., Inc.*, 114 Ariz. 66, 69, 559 P.2d 186, 189 (Ariz.Ct.App.1976) (recognizing

"[t]he general rule . . . that the exclusion of a physician from staff privileges in a private hospital is a matter which ordinarily rests within the discretion of the managing authorities thereof, not subject to judicial review." (Citations omitted)).

Finally, in *Mahmoodian v. United Hosp. Center, Inc.*, 185 W.Va. 59, 404 S.E.2d 750 (1991), we carved out a narrow exception to our holding in *Sams* for instances where there are allegations against a staff physician of professional incompetence or misconduct. In *Mahmoodian*, a physician challenged the revocation of his medical staff privileges at a private hospital after he was found to have committed improper conduct. The issue was "whether a decision of a private hospital adversely affecting a medical staff member's previously granted privileges at that hospital is subject to judicial review." 185 W.Va. at 64, 404 S.E.2d at 755 (footnote omitted). We distinguished our holding in *Sams* on the basis that it "involved . . . the denial of an *initial appointment* to a private hospital's medical staff," *id*, and explained that,

> the *scope of judicial review* of health care peer review decisions adversely affecting the privileges of a medical staff *member* is essentially the *same* for *private and public* hospitals."[12] While such decisions of public hospitals must be reached after affording "due process," and such decisions of private hospitals must be reached after affording "fair procedures," recent federal legislation will encourage essentially *all* hospitals to use the *same procedures*.

---

**12.** Our holding in *Mahmoodian* was due, in part, to the fact that "[u]nder the Federal Health Care Quality Improvement Act of 1986, 42 *U.S.C.* §§ 11101–11152, as amended, both public and private hospitals are encouraged to comply with that Act's standards for adequate notice and fair hearing with respect to health care peer review in order to be immune generally from monetary damages." *Mahmoodian*, 185 W.Va. at 65 n. 10, 404 S.E.2d at 756 n. 10 (citation omitted).

**13.** The plaintiffs make the interesting argument that because there are no allegations that they committed substandard medical care, they should enjoy a higher level of protection under *Mahmoodian*. We disagree. Allegations of professional incompetence or misconduct potentially adversely affect a physician's reputation, his or her standing in the medical community, his or her ability to obtain employment in any hospital,

185 W.Va. at 62 n. 2, 404 S.E.2d at 753 n. 2 (citation omitted and footnote added). Finally, we held in Syllabus Point 1 of *Mahmoodian:*

> The decision of a private hospital to revoke, suspend, restrict or to refuse to renew the staff appointment or clinical privileges of a medical staff member is subject to limited judicial review to ensure that there was substantial compliance with the hospital's medical staff bylaws governing such a decision, as well as to ensure that the medical staff bylaws afford basic notice and fair hearing procedures, including an impartial tribunal.

As noted above, the issue presently before us does not involve allegations of incompetence or misconduct and the invocation of the peer review process, thus we find that *Mahmoodian* is not relevant.[13] Accordingly, we will apply the law set forth in *Bronaugh* and *Sams* and our traditional distinction between public and private hospitals. We initially must determine the status of Monongalia General. If Monongalia General is a public or quasi-public [14] hospital, staff physicians have a general right to practice in its facilities [15] pursuant to *Bronaugh*.[16] Conversely, if it is a private hospital, there is no such right as provided in *Sams*.

Previously, in *Orteza, supra*, this Court discussed at length the status of Monongalia General, listing all of its public and private

---

and his or her licensure. In contrast, the inability to practice in one hospital due to a business decision of that hospital has no such negative consequences.

**14.** *See* discussion *infra*.

**15.** There is no evidence that the appellant physicians are not regularly licensed, failed to stay within the law, or failed to conform to all reasonable rules and regulations of Monongalia General.

**16.** Even though *Bronaugh* involved the initial denial of medical staff privileges to a physician, and the instant case involves the deprivation of privileges to those who are already staff physicians, this is of no significance to our analysis. If anything, the deprivation of staff privileges already granted merits a greater level of scrutiny.

characteristics.[17] After weighing these characteristics, we concluded,

> Certainly, the appellant Hospital Company lies somewhere in the twilight zone between a government instrumentality and a private charity. The record does not establish any nexus between the state and the Hospital Company's personnel decisions, and the trend in state action decisions would seem to be away from finding state action in cases involving personnel at quasi-public institutions. Nevertheless, we shall assume *arguendo,* that the hospital is a public agency for our purposes here and analyze the case before us from that point of view.

*Orteza,* 173 W.Va. at 466, 318 S.E.2d at 45 (footnote omitted).[18]

Based on *Orteza,* we conclude that Monongalia General, *if* not public, is certainly a quasi-public hospital. Further, as a quasi-public hospital, we believe that Monongalia General should be treated as a public hospital for the purpose of answering the certified question. "The trend of the decisions is to recognize that hospitals other than being completely private or public may also be classified as quasi-public. The quasi-public status subjects a hospital to the same responsibilities as a public hospital." *Rao,* 10 Wash.App. at 364, 517 P.2d at 242. Several courts have found that the quasi-public status of hospitals justifies greater judicial review and warrants treating the hospitals much the same as public hospitals. *Storrs v. Lutheran Hospitals, Etc.,* 609 P.2d 24, 28 (Alaska 1980)

**17.** The Legislature originally authorized the County Commission (then the County Court) of Monongalia County to establish the Monongalia County hospital in 1929. *See* Chapter 164, Acts of the Legislature, 1929, Regular Session. The hospital subsequently was reestablished in 1943, with the title to all hospital property vested in the County Commission of Monongalia County. *See* Chapter 112, Acts of the Legislature, 1943, Regular Session and *Shaffer v. Monongalia General Hospital,* 135 W.Va. 163, 62 S.E.2d 795 (1950). In 1974, the Monongalia County General Hospital Company was formed by private individuals for the purpose of providing financing for a new general hospital to be owned, when bonded indebtedness has been paid, by the County Commission. The predecessor Monongalia General Hospital Board of Trustees was dissolved, and its assets transferred to a Building Commission and leased to the private hospital corporation. *See Orteza v. Monongalia County General Hospital, supra.* The private corporation's articles of incorporation, and its subsequent amendments, provide that, upon dissolution and after the payment of debts, disposal of all of the corporation's assets are to be exclusively to the County Commission of Monongalia County.

In *Orteza,* this Court noted:

> The appellant hospital is housed in facilities that are owned by the Monongalia County Building Commission, a public body, and leased to the private hospital corporation. The hospital must make periodic financial reports to the county, which can then review them to insure proper management of the hospital. Moreover, the Monongalia County Building Commission exercises real and substantial power over the selection of members of the appellant's Board of Trustees. According to the Hospital's by-laws, the Board of Trustees submits three names to the Building Commission, which then has thirty days to select one of the nominees, if it finds one to be accept-

able. The Building Commission is a public body, an agency of the County Commission created specifically by the latter to accommodate the construction and administration of Monongalia General Hospital.

> Furthermore the hospital has been and remains dependent on public resources for its operation. Public funds financed nearly all of the construction of the appellant's physical plant and the county established the Building Commission specifically to secure funding from the Farmer's Home Administration. The Building Commission issued bonds to help finance construction, and the hospital derives more than one third of its revenue from governmental sources. At the time this case was tried the hospital also participated in the West Virginia Public Employees Retirement Plan, which through joint state and employee contributions, provides pension benefits to state employees....

> Having said all of that, however, it should also be noted that Monongalia General Hospital has several important private characteristics. The hospital was incorporated by private individuals ... as a conscious decision to move the facility away from the political arena and to make it a more attractive recipient of revenue bond funding. Thus, the hospital's private status can be seen as a necessary factor in its continued existence. Secondly, the Hospital Company receives no funding from the County Commission nor does it receive other direct payments from the state. Finally, the Hospital Company is classified by the Internal Revenue Service as a private, not-for-profit corporation.

*Orteza,* 173 W.Va. at 464–65, 318 S.E.2d at 43–44.

**18.** We note that the Preamble to Monongalia General's medical staff bylaws describes the hospital as "a public, not-for-profit corporation."

(holding that a privately owned hospital was subject to constitutional due process standards as a "quasi public" hospital because it was the only hospital serving the community and because it was significantly funded by government sources); *Brandt v. St. Vincent Infirmary,* 287 Ark. 431, 701 S.W.2d 103 (Ark.1985) (stating instances when a private hospital is considered public and subject to judicial review); *Silver v. Castle Memorial Hospital,* 53 Haw. 475, 497 P.2d 564 (1972) (holding that state and federal funding during hospital's construction subjects it to judicial review of denial of staff privileges). Accordingly, we hold that quasi-public hospitals have the same duty as public hospitals to admit regularly licensed physicians to membership on their medical staffs and are subject to the same level of judicial review of rules, regulations, or acts which have the effect of depriving staff physicians from practicing in their facilities.

■ Thus far, we have determined that staff physicians of public or quasi-public hospital may not be deprived of their privilege to practice in the hospital facilities by an act of the hospital that is unreasonable, arbitrary, capricious, or discriminatory. The dispositive issue, therefore, is whether it is reasonable for a hospital to execute an exclusive contract which has the effect of completely depriving other staff physicians from practicing in the hospital. Deciding this issue involves several important considerations.

■ First, as this Court recognized in *Bronaugh,* the privilege of practicing in a hospital is a valuable one.

> A physician or surgeon who is not permitted to practice his [or her] profession in a hospital is, as a practical matter, denied the right to fully practice his [or her] profession. Much of what a physician or surgeon must do in this day of advanced medical technology can be done only in a hospital. Only there are found the facilities necessary for proper diagnosis or treatment. Although one's right to practice medicine is not absolute and unqualified, it is a valuable franchise afforded to one properly trained which should be reasonably protected.

*Bronaugh,* 148 W.Va. at 575, 136 S.E.2d at 787. In the instant case, it is undisputed that the plaintiffs are totally prohibited from using Monongalia General's surgical suites. Dr. Kessel states in his brief that since the denial of his use of Monongalia General's facilities, he has supported his family by itinerant employment, providing anesthesia services from Clarksburg to Logan and beyond.

A second consideration is the discretion of hospital authorities to govern their institutions as they see fit. According to W.Va. Code § 7–3–15 (1986), the board of trustees vested with the administration and management of a county hospital "shall provide for the employment of and shall fix the compensation for and remove at pleasure all professional, technical and other employees, skilled or unskilled, as it may deem necessary for the operation and maintenance of the hospital[.]" This Court explained in *Wallington v. Zinn,* 146 W.Va. 147, 118 S.E.2d 526 (1961) that the power granted in W.Va.Code § 7–3–15 relates to,

> the overall duty and responsibility of the board in the efficient operation or management of the hospital, for the purpose for which created, the best service for the greatest number of people in the community. In the exercise of that discretion by the board, without arbitrariness, caprice or discrimination, the Courts can not interfere.

*Zinn,* 146 W.Va. at 153, 118 S.E.2d at 529–30 (citation omitted). The governing authority of Monongalia General is its board of directors. Under our Code of State Rules, the governing authority of a hospital is legally and morally responsible for the management and control of the entire hospital including appointment of medical staff. 64 C.S.R. §§ 12–7.1 and 7.2.1 (July 1, 1994).

A third and final consideration is the interest of patients in choosing their own physicians. For example, in the present case, several patients allegedly were denied the choice of the plaintiffs as their anesthesiologists due to Monongalia General's exclusive contract with other medical service providers. Ideally, a patient should be able to choose a physician with whom he or she has an ongoing doctor-patient relationship; one

with whom he or she is comfortable; and one in whom he or she has confidence. Without a doubt such patient control is more conducive to his or her overall mental, emotional, and physical health than being forced to rely on the hospital's choice of physician to render crucial medical services.[19] Admittedly, the desire to choose one's own anesthesiologist may not be great. Normally, a surgical patient chooses his or her surgeon, not his or her anesthesiologist, the identity of whom the average patient most likely is completely unaware.[20] Nevertheless, a patient should retain the right to choose his or her anesthesiologist even if he or she does not exercise that right. Also, this Court's answer to the certified question will apply to situations where the issue of patient choice may be of more significance.

■ After carefully weighing the above considerations, we hold that a public or quasi-public hospital may not enter into exclusive contracts with medical service providers that have the effect of completely excluding other physicians who have staff privileges at the hospital from the use of the hospital's medical facilities.[21] Our decision essentially is based on the determination that the *total* exclusion of physicians from their hospital practices, and the concomitant complete deprivation of patient choice, simply cannot be justified by the alleged ends to be achieved. In other words, this Court is convinced that a hospital can adopt less extreme measures to solve management problems such as scheduling conflicts and repeated delays in surgery complained of by Monongalia General.

We believe that one such measure of addressing a hospital's management problems, while still providing for the interests of physicians and patients, is the use of what we choose to call "a preferential contract." Such an agreement grants to a single medical services provider the primary right to practice in a specific department, but, unlike an exclusive contract, provides exceptions in instances where another staff physician is specifically requested by a patient. For example, under a preferential contract, Dr. Kessel, although not the primary provider of services in Monongalia General's anesthesiology department, would be allowed access to hospital facilities to treat patients when he is requested. A preferential contract has the advantage of not completely excluding staff physicians from practicing in the hospital. Also, the use of such contracts retains the discretion of hospital authorities to contract with primary service providers to prevent scheduling and staffing problems. Finally, it preserves patient choice of physicians.

In its brief to this Court, Monongalia General posits several arguments in favor of the use of exclusive contracts. We have already addressed some of these arguments in our discussion above, and the remaining ones do not persuade us. This Court is satisfied that our decision herein does not impede the ability of hospitals to effectively manage their institutions, and since it applies only to the execution of exclusive contracts, it does not preclude the authority of a hospital to close one of its departments as a reasonable business decision. Also, while we acknowledge that the weight of authority appears to support the right of hospitals to execute exclusive contracts, we do not agree with this authority. *See Gonzalez*, 880 S.W.2d at 441 (asserting that "[e]xclusive contracts have generally been upheld as a reasonable exercise of a hospital's board of trustees' power to provide for the proper management of the hospital." (Citation omitted)). We believe, rather, that the rule crafted in this opinion is

---

**19.** We held in Syllabus Point 2 of *Thomas v. Raleigh General Hospital*, 178 W.Va. 138, 358 S.E.2d 222 (1987), that "[w]here a patient goes to a hospital seeking medical services and is forced to rely on the hospital's choice of physician to render those services, the hospital may be found vicariously liable for the physician's negligence."

**20.** This would also be true of other types of in-hospital medical services such as radiology, pathology, and emergency care.

**21.** *But see Capili v. Shott, supra* (contract between public hospital and some of its staff members to operate a certain specialized facility to the exclusion of other physicians, equally qualified, is not necessarily unreasonable or arbitrary, and may be justified in view of the ends to be accomplished thereby).

consistent with our own previous holdings on the right of physicians to practice in the public hospitals of this State. Further, we reject the hospital's contention that there is a difference between being granted staff privileges at a hospital and actually being able to practice in a hospital's facilities. Monongalia General's medical staff bylaws define "privileges" as "the permission granted to a practitioner to render specific diagnostic, therapeutic, medical, dental or surgical services." "Medical Staff" is defined as "the formal organization of all licensed physicians, oral surgeons and dentists who are privileged to attend patients in the hospital." Finally 64 C.S.R. § 12–3.13, defines "Medical Staff" as "[t]he group of physicians ... who practice in the hospital[.]" Each of these definitions contemplates that physicians who have staff privileges enjoy the right actually to treat patients in the hospital.

## III.

### CONCLUSION

For the foregoing reasons, we answer the certified question as follows:

May a public or quasi-public hospital enter into an exclusive contract with a medical service provider that has the effect of completely excluding physicians who have staff privileges at the hospital from the use of the hospital's medical facilities. Answer: No.

Certified Question Answered.