James W. NELSON, D.V.M., Petitioner

v.

**STATE BOARD OF VETERINARY MEDICINE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 17, 2004.

Decided Dec. 7, 2004.

April L. McClaine, Harrisburg, for petitioner.

Teresa Lazo–Miller, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

James W. Nelson, D.V.M., petitions for review of an adjudication of the State Board of Veterinary Medicine (Board) holding that Dr. Nelson had violated the Veterinary Medicine Practice Act[1] (Act) when he verbally harassed the owner of a patient animal. To sanction this violation, the Board ordered a public reprimand and directed Dr. Nelson to enroll in courses designed to improve his ability to communicate with the owners of animals entrusted to his care.

The facts are not in dispute. On September 4, 2001, Betty Voorhies, who is 76 years old, brought her ailing 17–year old dog, "Lady," to Dr. Nelson's veterinary hospital to be euthanized. For a period of 14 years, Dr. Nelson had been Ms. Voorhies' veterinarian of choice for her animals; he had treated Lady for 12 years. With age, Lady had lost sight in one eye and had developed breathing difficulties. It was Dr. Nelson's longstanding recommendation that Lady be euthanized, and Ms.

1. Act of December 27, 1974, P.L. 995, *as amended,* 63 P.S. §§ 485.1–485.35.

Voorhies had made several appointments for the procedure. However, she changed her mind each time she arrived at Dr. Nelson's office. Accordingly, when Ms. Voorhies brought Lady to his office on the day in question, Dr. Nelson wanted to get the job done as quickly as possible. In his view, the dog was in "miserable shape" and suffering. Reproduced Record at 37a (R.R. ——).

With Ms. Voorhies in attendance, Dr. Nelson attempted to inject the solution into Lady's right front leg. Because of edema in that leg and her struggle, despite being held by a technician, the first attempt at injection was unsuccessful. Dr. Nelson's attempt on the dog's left front leg was also unsuccessful. Finally, Dr. Nelson injected the solution into the dog's jugular vein, causing the dog to howl and collapse. At that point, Ms. Voorhies cried and yelled at Dr. Nelson, accusing him of killing her dog; she demanded that he bring Lady back to life. Dr. Nelson firmly and directly informed Ms. Voorhies that he did not hurt Lady and left the room to allow his technician to calm Ms. Voorhies.

Thereafter, Ms. Voorhies filed a complaint with the Department of State, Bureau of Enforcement and Investigations (Department) to complain about the manner in which Lady had been euthanized. As a result, Edward Tonelli, an investigator for the Department, contacted Dr. Nelson. On February 28, 2002, Dr. Nelson and Mr. Tonelli met at Dr. Nelson's office.

During the interview, Dr. Nelson became angry, loud and agitated. He told Mr. Tonelli that the complaint was ridiculous and denied any wrongdoing, referring to Ms. Voorhies as a "* * * * * * * wacko." R.R. 31a, 60a. While the interview was still in progress,[2] Dr. Nelson telephoned Ms. Voorhies and attempted to persuade her to withdraw the complaint. Ms. Voorhies responded in loud tones, accusing Dr. Nelson of torturing and murdering her dog, Lady. In turn, Dr. Nelson yelled at Ms. Voorhies, stating that her soul would "rot in hell" for what she was trying to do to him.[3] R.R. 32a. Ms. Voorhies hung up on Dr. Nelson. Dr. Nelson attempted twice to call her back while Mr. Tonelli was still in the office, but Ms. Voorhies hung up the telephone each time.

On September 3, 2003, the Department issued an Order to Show Cause to Dr. Nelson. The Order alleged that Dr. Nelson had "deviated from the standards of acceptable and prevailing medical practice and/or committed professional incompetence by verbally harassing the owner of a patient animal." Order to Show Cause at ¶ 20. The Order asserted that this conduct violated the Act's proscription against veterinary malpractice and professional incompetence as set forth in Sections 21(11) and 21(20) of the Act, 63 P.S. §§ 485.21(11) and 485.21(20).

Dr. Nelson answered, in letter form. He did not deny the facts in the Order to Show Cause but, rather, gave his version of them. He explained that Ms. Voorhies was a difficult and unbalanced woman, who had a history of hiring and firing veterinarians. As an example of Ms. Voorhies' instability, he cited her account to him that certain physicians had transferred Ms. Voorhies' elderly mother from a nursing home to a hospital in order to kill her, and

2. There was conflicting testimony about whether Mr. Tonelli was present when Dr. Nelson phoned Ms. Voorhies or interviewing Dr. Nelson's staff in another room.

3. Dr. Nelson acknowledged to the Board that he continues to pray "every night" that Ms. Voorhies will rot in hell. R.R. 32a. Dr. Nelson explained, "I'm not somebody who is real diplomatic, I'll grant you that." R.R. at 54a.

they did so. Dr. Nelson persuaded Ms. Voorhies not to pursue this claim in a malpractice suit against her mother's physicians. Ms. Voorhies called Dr. Nelson at home and at all hours of the night. He acknowledged describing Ms. Voorhies to Mr. Tonelli as a " * * * * * * * wacko;" however, Dr. Nelson explained that he has known Mr. Tonelli for 20 years and did not believe his statement to be "official." Dr. Nelson stated that he and his staff had done much to accommodate Ms. Voorhies and were disturbed that she had turned on them "so viciously." R.R. 11a. Dr. Nelson requested judgment in his favor.

After a hearing, at which Dr. Nelson and Mr. Tonelli testified, the Board issued its adjudication. The Board dismissed the charge that Dr. Nelson violated Section 21(11) of the Act, 63 P.S. § 485.21(11), concluding that this statutory provision governed the veterinarian's treatment and care of an animal patient. The Department, however, had not charged Dr. Nelson with mistreatment of an animal, but, rather, mistreatment of an animal's owner. The Board did find that Dr. Nelson demonstrated "professional incompetence" by verbally harassing Ms. Voorhies, in violation of Section 21(20) of the Act, 63 P.S. § 485.21(20). The Board ordered a public reprimand of Dr. Nelson. It further ordered Dr. Nelson to complete a veterinary medicine continuing education course on how to deal with the bereaved owner of a euthanized animal, to participate in an anger management course and to send a letter of apology to Ms. Voorhies. Dr. Nelson then petitioned for our review.

On appeal,[4] Dr. Nelson raises four issues for our consideration. First, Dr. Nelson contends that the Act regulates the practice of veterinary medicine, which is the relationship between a veterinarian and his animal patient. Because the record is bereft of evidence that Dr. Nelson was negligent in his practice of veterinary medicine, the Board erred in holding that he was guilty of professional incompetence. Second, the Board exceeded its statutory authority, thereby abusing its discretion, in imposing sanctions for conduct that is not regulated by the Act. Third, Section 21(20) of the Act is unconstitutionally overbroad and vague to the extent it purports to prohibit a heated exchange between an animal patient's owner and a veterinarian. Fourth, Dr. Nelson's hearing did not comport with due process because a Board member directed questions to Dr. Nelson at the hearing, thereby commingling the Board's prosecutorial and adjudicatory functions.

The Board counters that the Act authorizes it to discipline licensed veterinarians for conduct that affects not only their animal patients but also their human owners and the public generally. The Board argues that its sanction of Dr. Nelson was lenient and narrowly tailored to remediate his offensive conduct. It also contends that the Board member's questioning of Dr. Nelson, who appeared *pro se* before the Board, helped to develop testimony that was mitigating and favorable to Dr. Nelson's case.[5] It disputes the notion that

4. The Court's review of the Board's adjudication is whether the Board violated constitutional rights, committed an error of law, or whether all material findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704. An agency's determination will be set aside if the agency has abused its discretion, exceeded its authority or misapplied the law. *Id.*

5. Dr. Orsini, a Board member and licensed veterinarian, questioned Dr. Nelson about the technical aspects of Lady's euthanasia. Both considered whether sedating Lady in advance might have improved the euthanasia. Dr. Orsini also asked Dr. Nelson about his post-euthanasia communications with Ms. Voorhies. He questioned, for example, whether

individual Board members may not speak to a respondent during a hearing.

Dr. Nelson's central argument is that the Act does not prohibit a licensed veterinarian from making loud, angry or discourteous remarks to the owner of an animal or to the public generally, including a Department investigator. The Act and its implementing regulations focus on the veterinarian's duties to animal patients, and not to their owners. In this context, Dr. Nelson maintains that the prohibition against "professional incompetence" applies to the conduct of a veterinarian towards the patient animal and not conduct towards the animal's owner.

It is true that the focus of the Act is the treatment and care of animals by licensed veterinarians. Section 3 of the Act defines "veterinary medicine" as

> *that branch of medicine which deals with* the diagnosis, prognosis, *treatment,* administration, prescription, operation or manipulation or application of any apparatus or appliance for any disease, pain, deformity, defect, injury, wound, physical condition or mental condition requiring medication *of any animal* or for the prevention of or the testing for the presence of any disease.

63 P.S. § 485.3 (emphasis added). Similarly, the "practice of veterinary medicine" is defined by reference to the diagnosis and treatment of animals, animal conditions and animal diseases.[6] The Act regulates the practice of veterinary medicine requiring, of course, that such practitioners meet the exacting standards in the Act for licensing. Section 9 of the Act, 63 P.S. § 485.9.[7]

---

Dr. Nelson had sent Ms. Voorhies a card or letter of condolence.

**6.** Section 3 of the Act, 63 P.S. § 485.3(10) provides,

(10) "Practice of veterinary medicine" includes, but is not limited to, the practice by any person who (i) diagnoses, treats, corrects, changes, relieves or prevents animal disease, deformity, injury or other physical, mental or dental conditions by any method or mode, including the prescription or administration of any drug, medicine, biologic, apparatus, application, anesthetic or other therapeutic or diagnostic substance or technique, (ii) performs a surgical operation, including cosmetic surgery, upon any animal, (iii) performs any manual procedure upon an animal for the diagnosis or treatment of sterility or infertility of animals, (iv) represents himself as engaged in the practice of veterinary medicine, (v) offers, undertakes, or holds himself out as being able to diagnose, treat, operate, vaccinate, or prescribe for any animal disease, pain, injury, deformity, or physical condition, (vi) uses any words, letters, or titles in such connection or under such circumstances as to induce the belief that the person using them is engaged in the practice of veterinary medicine and such use shall be prima facie evidence of the intention to represent himself as engaged in the practice of veterinary medicine, (vii) performs diagnostic veterinary pathology, (viii) implants electronic identification, as determined by the board, upon any animal, (ix) renders advice or recommendation by any means, including the electronic transmission of data with regard to any of the above, or (x) removes any embryo from an animal for the purpose of transferring such embryo into another animal or cryopreserving such embryo, except it shall not be considered the practice of veterinary medicine when: (a) a person or his full-time employe removes or transfers an embryo from the person's own animals for the purpose of transferring or cryopreserving the embryo so long as ownership of the animal is not transferred or employment of the person is not changed for the purpose of circumventing this act or (b) a person independently, with indirect veterinary supervision, implants any embryo into an animal.

**7.** Section 9 establishes that to qualify for a license as a veterinarian, an individual must be trained at an approved school of veterinary medicine, pass an examination of the Board and have a clean criminal history with respect to use of controlled substances and drugs.

The Act does not solely address the relationship between veterinarian and an animal; it also addresses the relationship between a veterinarian and the owner of the patient animal, who is termed the "client." Section 3 of the Act defines the veterinarian-client-patient relationship as one where the veterinarian assumes responsibility for making medical judgments about the animal, and the "client, owner or caretaker" of the animal agrees to follow the instructions of the veterinarian.[8] The veterinarian has the duty to the client to be available in the event a treatment fails and to keep appropriate records. Section 3(15)(iv) and (v), 63 P.S. § 485.3(15)(iv) and (v). Section 3 of the Act is otherwise silent on the interaction between a veterinarian and a client.

The Board's regulations provide additional detail on what is expected of a licensed veterinarian with respect to a client.[9] They require that a veterinarian cooperate with an owner's request for referral or consultation with another veterinarian and to respect an owner's right to privacy. As between the owner and animals, however, veterinarians "should con-

8. It states:
"Veterinarian-client-patient relationship" means a relationship satisfying all of the following conditions: (i) *the veterinarian has assumed the responsibility for making veterinary medical judgments regarding the health of an animal* and the need for veterinary medical treatment, *and the client, owner or caretaker of the animal has agreed to follow the instructions of the veterinarian;* (ii) the veterinarian has sufficient knowledge of the animal to initiate at least a general, preliminary or tentative diagnosis of the medical condition of the animal; (iii) the veterinarian is acquainted with the keeping and care of the animal by virtue of an examination of the animal or medically appropriate and timely visits to the premises where the animal is kept; (iv) *the veterinarian is available for consultation* in cases of adverse reactions to or failure of the regimen of therapy; (v) *the veterinarian maintains records on the animal* examined in accordance with regulations established by the board.
63 P.S. § 485.3(15) (emphasis added).

9. This regulation states:
**Principle 7. Veterinarian/client relationships.**
(a) Veterinarians may choose whom they will serve. Once they have undertaken the care of an animal, however, they may not neglect the animal.
(b) *In their relations with clients, veterinarians should consider first the welfare of the animal for* the purpose of relieving suffering and disability while causing a minimum of pain or fright. Benefit to the animal should transcend personal advantage or monetary gain in decisions concerning therapy.
(c) *Veterinarians and their staffs shall protect the personal privacy of clients,* unless the veterinarians are required by law to reveal the confidences or it becomes necessary to reveal the confidences to protect the health and welfare of an individual, the animal or others whose health and welfare may be endangered.
(d) Veterinarians shall be fully responsible for their actions with respect to an animal from the time they accept the case until the animal is released from their care.
(e) In the choice of drugs, biologics or other treatments, veterinarians should use their professional judgment in the interests of the animal, based upon their knowledge of the condition, the probable effects of the treatment and the available scientific evidence which may affect these decisions.
(f) *If a client desires to consult with another veterinarian* about the same case, the first veterinarian shall readily withdraw from the case, indicating the circumstances on the veterinary medical record of the animal, and shall forward copies of the animal's veterinary medical records to other veterinarians who request them.
(g) *If a client requests referral to another veterinarian or veterinary hospital, the attending veterinarian shall honor the request* and facilitate the necessary arrangements, which shall include forwarding copies of the veterinary medical records of the animal to the other veterinarian or veterinary hospital.
49 Pa.Code § 31.21, Principle 7 (emphasis added).

sider first the welfare of the animal." 49 Pa.Code § 31.21, Principle 7(b).

Against these relevant portions of the Act and regulations, we consider the meaning of "professional incompetence" for which Dr. Nelson was "found guilty." Section 21 of the Act provides in relevant part as follows:

The board shall suspend or revoke any license or certificate or otherwise discipline an applicant, licensee or certificate holder who is found guilty by the board or by a court of one or more of the following:

\* \* \*

(11) *Incompetence,* gross negligence or other malpractice, or the departure from, or failure to conform to, the standards of acceptable and prevailing veterinary medical practice, in which case actual injury need not be established.

\* \* \*

(20) *Professional incompetence.*

63 P.S. § 485.21(11) and (20) (emphasis added). The term "professional incompetence" is not defined in either the Act or the regulation. The Board contends that "incompetence," as used in Section 21(11), relates to malpractice in the science of veterinary medicine and that "professional incompetence," as used in Section 21(20), relates to more general conduct, such as Dr. Nelson's egregious behavior. Any other interpretation, the Board notes, would render the prohibition against "professional incompetence" mere surplusage of the prohibition in Section 21(11) of the Act. Accordingly, a licensee who intimidates, harasses or seeks to compel persons to

withdraw their complaints has demonstrated "professional incompetence." Dr. Nelson contends, on the other hand, that professional incompetence is synonymous with malpractice in the technical practice of veterinary medicine.

■■■ The best indication of legislative intent is the plain language of a statute. *Commonwealth v. Gilmour Manufacturing Co.*, 573 Pa. 143, 148, 822 A.2d 676, 679 (2003). In construing statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." 1 Pa.C.S. § 1903. Equally bedrock is the principle that a statute "be construed, if possible, to give effect to all its provisions," lest a provision be rendered mere surplusage. 1 Pa.C.S. § 1921(a). The agency charged with administration of an act is entitled to deference in its interpretation of that act. Nevertheless, the meaning of a statute is a question of law for the courts; [10] when convinced that the statutory interpretation adopted by an administrative agency violates legislative intent, courts may disregard the interpretation. *Gilmour*, 573 Pa. at 149, 822 A.2d at 679.

To support his proffered interpretation of "professional incompetence," Dr. Nelson first directs our attention to a case in which the term "professional incompetence" was used to signify professional malpractice. In *Pennsylvania State Police v. Klimek*, 839 A.2d 1173 (Pa.Cmwlth. 2003), we considered the personal property exception to sovereign immunity and used the term "professional incompetence" in our discussion of another case. That case was *Department of Environmental Resources v. Myers*, 135 Pa.Cmwlth. 526, 581

10. The proper construction of a statute is a question of law and, thus, our review is plenary. *See C.B. ex rel. R.R.M. v. Com., Depart-* *ment of Public Welfare*, 567 Pa. 141, 148, 786 A.2d 176, 180–181 (2001).

A.2d 696 (1990).[11] In *Myers,* the issue was whether the Department of Environmental Resources (DER) could be held liable for the negligent placement of balloons used to mark the area to be sprayed with gypsy moth pesticides and for providing a typographical map that did not show power lines. The helicopter pilot under contract with DER was injured when his helicopter ran into power lines, and he asserted that DER's personal property, *i.e.,* the balloons, caused his injuries. Summarizing the *Myers* holding, we explained as follows:

> [W]e held that the placement of the balloons did not cause the injury, but merely facilitated another kind of negligence—*professional incompetence.*

*Klimek,* 839 A.2d at 1176 (emphasis added). Accordingly, the pilot failed to defeat DER's defense of sovereign immunity.

Admittedly, in *Klimek,* we used the term "professional incompetence" to denote a type of negligence. However, the meaning of "professional incompetence" was not at issue in *Klimek,* and our use of the term was, at most, *dictum.* Further, we used the term in the abstract and not with reference to the use of that term in a statute, as is the case here. Nevertheless, we agree with Dr. Nelson that "professional incompetence," as that term was used in *Klimek,* signified professional negligence, which in that case was the negligent operation of a helicopter by a licensed, professional pilot.

More to the point is that precedent offered by Dr. Nelson that addresses a statute's meaning of "incompetence." We have specifically considered the meaning of "incompetence" in a statute regulating the conduct of one engaged in a licensed activity, such as the practice of veterinary science, and whether "incompetence" is a concept that includes inappropriate behavior by a licensed professional.

In *Chaby v. State Board of Optometrical Examiners,* 35 Pa.Cmwlth. 551, 386 A.2d 1071 (1978), an optometrist appealed his license suspension that resulted from a patient complaint. Dr. Chaby was charged with misrepresentation[12] and gross incompetency. We looked to Webster's Third New International Dictionary (1966) for the meaning of "incompetency," finding that it means

> lacking the qualities (as maturity, capacity, initiative, intelligence) necessary to effective independent action; insufficiency; inadequacy.

*Chaby,* 386 A.2d at 1074. We held that Dr. Chaby's failure to notify patients of the location of his new office and telling a patient to "go to hell" were reprehensible, but not incompetent, let alone grossly incompetent.[13]

In *Ciavarelli v. State Board of Funeral Directors,* 129 Pa.Cmwlth. 305, 565 A.2d 520 (1989), we reversed an adjudication that sanctioned a funeral director who challenged a Roman Catholic priest for allegedly directing parishioners to a particular funeral home. Specifically, the priest alleged that the funeral director made an "irate telephone call" to the priest's secretary "admonishing" the priest for favoring one funeral home over another. *Ciavarelli,* 565 A.2d at 522. We held that this "impudent" conduct did not constitute

---

**11.** The term "professional incompetence" did not make an appearance in *Myers.*

**12.** It was alleged, but never proven by substantial evidence, that Dr. Chaby described his associate optician as an optometrist.

**13.** Telling an individual that her soul will "rot in hell" is simply a variation of "go to hell."

gross incompetency, negligence or misconduct in carrying out the profession.

*Chaby* and *Ciavarelli* both support Dr. Nelson's contention that rude and discourteous behavior do not fall within the ambit of "professional incompetence."[14] The conclusion in both cases was that poor manners do not equate with competence. *Ciavarelli* is particularly instructive because the State Board of Funeral Directors had adopted a regulation stating that conduct found to be "unprofessional" could form the basis of an enforcement action. We noted that

> [t]he regulation under which the petitioner's license was suspended is vague. This Section is an all-encompassing regulation which allows the [State] Board [of Funeral Directors] to impose a sanction for any reason it sees fit.... [I]n the past, this Court has held that conduct alleged to have been violative of a statute, but not enumerated in that statute, cannot be the basis for a finding of grossly unprofessional conduct.

*Ciavarelli,* 565 A.2d at 524.

*Chaby* and *Ciavarelli* addressed "incompetence;" here, we deal with "professional" incompetence. Case law has defined a "professional" as one engaged in a learned profession, such as dentistry, teaching, architecture or engineering. *Reich v. City of Reading,* 3 Pa.Cmwlth. 511, 284 A.2d 315, 319 (1971); *see also* Black's Law Dictio-

nary 1246 (8th ed.1999). When used as an adjective, as it is in Section 21(20) of the Act, "professional" means pertaining to the profession, here the practice of veterinary medicine. *See* Webster's Third International Dictionary (2002) at 1811, which defines "professional" as "of, relating to, or characteristic of a profession or calling." "Professional" is a limiting modifier. Accordingly, the holding in *Chaby* and *Ciavarelli* that "incompetence" does not encompass poor manners applies with equal strength to the meaning of "professional incompetence."[15] There are additional reasons that support this conclusion.

First, as noted above, the Act identifies duties of both the animal owner and the veterinarian in the definition of "veterinarian-client relationship." Section 3 of the Act, 63 P.S. § 485.3(15). This statutory provision is silent on whether a veterinarian must keep his temper in check when faced by a trying client or being interviewed by an investigator.

Second, the Board's own regulations, which bind the Board, do not support its proffered interpretation of "professional incompetence." The Board "has determined [that its rules of Professional Conduct] are necessary .... to protect the public against unprofessional conduct on the part of veterinarians." 49 Pa.Code § 31.21, Preamble. Accordingly, the Board's Rules address a variety of profes-

---

14. The statutory standard applicable in *Chaby* and *Ciavarelli* was "gross" incompetence; however, that difference does not affect the analysis here where the degree of incompetence is not the issue.

15. Courts from other jurisdictions use the term "professional incompetence" to denote a departure from the technical standards required to practice a profession. *See e.g., State v. Alexander,* 875 So.2d 853 (La.Ct.App.2004) (a lawyers' choice of strategy in a criminal trial court did not constitute professional incompetence simply because the strategy

failed); *Kessel v. Monongalia County General Hospital Co.,* 215 W.Va. 609, 600 S.E.2d 321 (2004) (holding that revocation of a physician's staff privileges on the basis of professional incompetence in the physician's field of practice requires a fair hearing); *Matter of Bruce,* 97 N.C.App. 138, 387 S.E.2d 82 (1990) (engineer's failure to disclose the structural deficiency in a school building constituted professional incompetence). *See also* J.A. Glenn, Annotation, *Professional Incompetency as Ground for Disciplinary Measure Against Physician or Dentist,* 28 A.L.R.3d 487 (1996).

sional activities, but they do not address how a veterinarian should speak to or about a human client.[16] Indeed, the Rules identify professional "competency" as the need to increase "veterinary knowledge" and to recognize when to refer a patient animal to another professional.[17]

Finally, if we were to accept the Board's interpretation, we risk rendering the Act vague and unconstitutional. *See Watkins v. State Board of Dentistry*, 740 A.2d 760 (Pa.Cmwlth.1999). A statute or regulation is unconstitutionally vague when its terms are not sufficiently specific to inform those who are subject to it what conduct on their part will render them liable to its penalties. *Oppenheim v. Department of State, Bureau of Professional and Occupational Affairs, State Dental Council and Examining Board*, 74 Pa. Cmwlth. 200, 459 A.2d 1308, 1315 (1983). A statute that forbids conduct in terms so vague that men of common intelligence must necessarily guess at the statute's meaning and differ as to its application violates due process. *Id.* Thus, to expand the meaning of "professional incompetence," as argued by the Board, would leave persons of common intelligence wondering where the line was drawn on "professional incompetence." It might proscribe the type of conduct addressed in *Miss Manner's Guide to Excruciatingly Correct Behavior* or it might proscribe the improper use of a scalpel in the operating room.

"Incompetence" is prohibited twice in Section 21 of the Act. The Board is correct that we must give effect to each use of the word. We believe, and hold, that subsection (11) prohibits an act or omission that results in negligent care of an animal.[18] Subsection (20), which prohibits "professional incompetence," allows the Board to sanction a veterinarian who has allowed the risk of malpractice to increase unacceptably but has not, yet, committed veterinary malpractice. Subsection (20) requires a veterinarian to maintain a high level of professional proficiency, to recognize the limits of his own expertise and to refer a patient animal to another veterinarian to avoid an act of malpractice. This is how the Board has interpreted "competency" in its own regulation at 49 Pa.Code § 31.21, Principle 1 (Competency).[19] Read in this manner, subsections

---

**16.** The Rules address: competency, professional responsibility, professional behavior, fees, advertising, professional relationships, veterinarian/client relationships and drugs. 49 Pa.Code § 31.21. None relate to the type of behavior exhibited by Dr. Nelson.

**17. Principle 1. Competency**
(a) *Veterinarians should strive continually to improve their veterinary knowledge and skill,* making available to clients and their colleagues the benefit of their professional attainments.
(b) Veterinarians should seek, through consultation, the assistance of other veterinarians or other licensed professionals when it appears that the quality of veterinary service may be enhanced through consultation.
(c) *Veterinarians shall participate in continuing education programs* as provided under section 18 of the act (63 P.S. § 485.18).

(d) Veterinarians shall safeguard the public and the veterinary profession against veterinarians deficient in professional competence or ethical conduct as described in this chapter....
49 Pa.Code § 31.21, Principle 1 (emphasis added).

**18.** Thus, it prohibits "incompetence ... or other ... failure to conform to ... the standards of acceptable ... veterinary medical *practice....*" Subsection 21(11) of the Act, 63 P.S. § 485.21(11).

**19.** The Board's promulgation of Rules of Professional Conduct explicating the meaning of "competency" protects the Act from a vagueness challenge. *Cf. Jones v. Foster*, 148 Pa. Cmwlth. 303, 611 A.2d 332 (1992) (wherein this Court held that statutory criteria for licensing agents such as "good business reputa-

(11) and (20) are not redundant of each other but, rather, complementary.

 Dr. Nelson's response to Ms. Voorhies' complaint was "unprofessional," which is generally understood to be conduct "not characteristic of or befitting a member of a profession." *See* Webster's Third International Dictionary (2002) at 2506. Dr. Orsini expressed this understanding of professionalism at the hearing. He noted that when a client is abusive,

> I think that's when we have to raise ourselves above that kind of behavior and try to present ourselves in a way that, in fact, says that we understand the difficulty you are going through. You have to have a little bit of a thick skin....

R.R. 45a. This is sage advice for any professional, whether a veterinarian, barber or lawyer. However, the Act does not allow the Board to suspend or revoke a veterinarian's license for lack of professionalism. "Unprofessional conduct"[20] is not the same as "professional incompetency," and we reject the Board's attempt to treat them as identical concepts.

The General Assembly has empowered the Board to sanction behavior that demonstrates professional incompetence. Because Dr. Nelson's inexcusably rude conduct was not an instance of professional incompetence, we must reverse the Board's adjudication.[21]

### ORDER

AND NOW, this 7th day of December, 2004, the order of the State Board of Veterinary Medicine dated May 12, 2004 in the above-captioned matter is hereby reversed.

---

tion" and "worthy" were inexact and vague but saved by regulations that clarified the statutory criteria).

**20.** In *Ciavarelli*, we held that a regulation of the State Board of Funeral Directors prohibiting unprofessional conduct was vague and unenforceable except as to the specific examples listed of such conduct in the regulation.

*Ciavarelli*, 565 A.2d at 524. Accordingly, even if the Act expressly prohibited "unprofessional conduct" by veterinarians, due process would require the Act to enumerate specific instances of the prohibited conduct.

**21.** Because of this conclusion, we need not address the other issues raised by Dr. Nelson.