648 S.E.2d 366

James W. KESSEL, M.D., Richard M. Vaglienti, M.D., and Stanford J. Huber, M.D., Plaintiffs Below, Appellants

v.

MONONGALIA COUNTY GENERAL HOSPITAL COMPANY, d/b/a Monongalia General Hospital, a West Virginia Non–Profit Corporation, Mark Bennett, M.D., individually, Bennett Anesthesia Consultants, P.L.L.C. and Professional Anesthesia Services, Inc., Defendants Below, Appellees,

No. 33096.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 27, 2007.

Decided June 6, 2007.

Dissenting Opinion of Justice Starcher June 29, 2007.

**606**

Anthony J. Majestro, Powell & Majestro, P.L.L.C., C. Michael Bee, Susan B. Tucker, Hill Peterson Carper Bee & Deitzler, P.L.L.C., Charleston, for Appellants Richard D. Vaglienti, M.D. and Stanford J. Huber, M.D.

Frank E. Simmerman, Jr., Simmerman Law Office, P.L.L.C., Clarksburg, for Appellant James W. Kessel, M.D.

Gordon H. Copland, Amy M. Smith, Steptoe & Johnson, P.L.L.C., Clarksburg, John M. Fitzpatrick, LeClair Ryan, Richmond, VA, for Appellee Monongalia County General Hospital d/b/a Monongalia General Hospital.

Charles T. Berry, Bowles Rice McDavid Graff & Love, L.L.P., Morgantown, for Appellees Bennett Anesthesia Consultants, P.L.L.C. and Mark Bennett, M.D.

Charles C. Wise, III, Bowles Rice McDavid Graff & Love, L.L.P., Morgantown, for Appellee Professional Anesthesia Services, Inc.

Brenda Nichols Harper, Charleston, for Amicus Curiae West Virginia Chamber of Commerce.

Kent J. George, Robinson & McElwee, P.L.L.C., Charleston, for Amicus Curiae, West Virginia Business and Industry Council.

BENJAMIN, Justice:

On December 29, 2005, the Circuit Court of Monongalia County entered an order granting partial summary judgment with respect to all claims arising under state antitrust law asserted by James W. Kessel, M.D., Richard D. Vaglienti, M.D. and Stanford J. Huber, M.D. (hereinafter collectively "Appellants") against Monongalia County General Hospital d/b/a Monongalia General Hospital (hereinafter "Monongalia General"), Mark Bennett, M.D., and Bennett Anesthesia Consultants, P.L.L.C. (hereinafter collectively "BAC"), and Professional Anesthesia Services, Inc. (hereinafter "PAS").[1] In Count III of their complaints, which were consolidated for resolution before the circuit court, Appellants asserted that two "exclusive" contracts, one between Monongalia General and BAC and one between Monongalia General and PAS, for the provision of operative anesthesiology services at Monongalia General constituted a "restraint of trade" in violation of the West Virginia Antitrust Act, W. Va. § 47–18–1, et seq., (hereinafter the "WVATA"). According to the Appellants, the circuit court erred by (1) following federal precedent developed under the Sherman Act, 15 U.S.C. § 1, et seq., in interpreting the WVATA; (2) determining that the provisions of W. Va.Code § 47–18–3(b) (1978), were "com-

---

1. By order dated March 30, 2006, the Circuit Court of Monongalia County amended its December 29, 2005, order to include language required by Rule 54(b) of the *West Virginia Rules of* *Civil Procedure* to permit Appellants to immediately appeal the December 29, 2005, order to this Court without waiting for their remaining claims to be adjudicated.

parable" to the Sherman Act; and (3) finding that the contracts at issue do not violate the *per se* restrictions contained in W. Va.Code § 47–18–3(b) and W. Va.C.S.R. § 142–15–3 (1991). Upon due consideration of the arguments presented by the parties and the pertinent legal authorities, we affirm the circuit court's partial summary judgment order.[2]

## I.

## FACTUAL AND PROCEDURAL HISTORY

On March 24, 1975, Monongalia Anesthesia Associates (hereinafter "MAA") entered into a contract with Monongalia General for the exclusive provision of anesthesia services at the hospital.[3] Each of the appellants were shareholders and employees of MAA. In the early 1990's the MAA and Monongalia General began a renegotiation of the contract. Although the result of these negotiations is not clear from the record before this Court, it appears that MAA continued to exclusively provide the anesthesiological services, except for cardio-thoracic surgeries, at Monongalia General until December 30, 1998, when Monongalia General entered the contract with BAC, at issue herein, for the exclusive provision of orthopedic surgical anesthesia. Thereafter, Monongalia General and MAA were unable to reach an agreement regarding MAA's exclusive provision of all non-cardio-thoracic and non-orthopedic surgical anesthesia services at the hospital. Monon-

galia General then solicited a request for proposal from a number of providers of surgical anesthesia services, including MAA, for the exclusive provision of these remaining surgical anesthesia services. As a result of this solicitation, Monongalia General entered the contract with PAS, at issue herein.

Subsequently, Appellants initiated suit alleging tortious interference with business relationships, due process violation/failure to provide a fair hearing pursuant to medical staff by-laws, restraint of trade, breach of contract and breach of the covenants of good faith and fair dealing. Previously, in *Kessel v. Monongalia General Hospital Company, dba Monongalia General Hospital*, 215 W.Va. 609, 600 S.E.2d 321 (2004) (hereinafter "*Kessel I* "), this Court responded to a question certified by the circuit court regarding Monongalia General's ability to enter into exclusive contracts. Appellants' antitrust claims were not at issue in *Kessel I*. In *Kessel I*, this Court examined Monongalia General's legal authority to enter into exclusive contracts in light of its status as a quasi-public hospital. Monongalia General's status as a quasi-public hospital was significant because, subject to compliance with applicable law and hospital rules and regulations, a "physician or surgeon is entitled to practice in the public hospitals of this state" and that "quasi-public hospitals have the same duty as public hospitals to admit regularly licensed

---

**2.** We also acknowledge and appreciate the contribution of *amici curia* the West Virginia Chamber of Commerce and the West Virginia Business and Industry Council to the legal arguments presented for our consideration herein.

**3.** Although an actual copy of the 1975 contract does not appear in the record before this Court, various letters written by MAA counsel and representatives are contained within the record and confirm the existence of such a contract. For example, a June 30, 1989, letter written by Michael J. Dempster, counsel for MAA during renegotiation of the contract states "the current agreement, that was signed on March 24, 1975, contemplates anesthesia services being provided exclusively by Mon Anesthesia Associates." Additionally, a June 20, 1987, letter authored by Erdogan Ternan, M.D., MAA President, related to the "provision of anesthesia services for the open heart surgical procedures" by an anesthesia team from West Virginia University Hospital and gave "our consent to this approach *as an exception to*

*our otherwise exclusive right to provide anesthesia services at Monongalia General Hospital."* (Emphasis added). The June 20, 1987, letter also stated that the consent was "limited to the provision of anesthesia services in connection with open heart surgery. In all other respects, the existing agreement between [MAA] and the Hospital [was to] continue[ ] in full force and effect." Additionally, a Letter of Agreement was signed by Appellant Huber, as president of MAA, on June 23, 1992, documented a preliminary agreement between MAA and Monongalia General for the provision of anesthesia services through December 31, 1992, and an agreement to work "in good faith to develop and execute, by December 31, 1992, a contract for exclusive anesthesia services, excluding cardio-thoracic (open-heart) surgery services." Further, Monongalia General agreed therein to "not seek a permanent anesthesia services contract from any other group" during that time period.

physicians to membership on their medical staffs." Syl. pts. 9 and 11, *Kessel I,* in part. In light of these findings, this Court held, in syllabus point 12 of *Kessel I,* that "a public or quasi-public hospital may not enter into exclusive contracts with medical service providers that have the effect of completely excluding other physicians who have regular staff privileges at the hospital from the use of the hospital's medical facilities." An important consideration for the Court in *Kessel I* was a patient's right to choose his or her physician. Therefore, while prohibiting exclusive contracts in public and quasi-public hospitals, the Court noted that the hospital may still enter into preferential contracts pursuant to which the hospital contracts with primary service providers who then provide the designated service *unless* a patient requests that another staff physician perform the service. *Kessel I,* 215 W.Va. at 621, 600 S.E.2d at 333.

Contrary to Appellants' suggestion, this Court's decision in *Kessel I* does not impact their claims regarding violation of the WVA-TA. Simply because a public or quasi-public hospital is prohibited, under West Virginia law, from entering into an exclusive contract with certain service providers does not automatically result in that same contract violating our antitrust laws.[4] Violation of antitrust laws constitutes a separate legal inquiry.

Appellants' complaints allege that Monongalia General's contracts with BAC and PAS are a "restraint of trade" which constitute "exclusive dealings." Although their complaints simply assert "restraint of trade," Appellants rely upon W. Va.Code § 47–18–3(b) and W. Va.C.S.R. § 142–15–3 in support of their claims before both the circuit court and this Court. West Virginia Code § 47–18–3, entitled "Contracts and combinations in restraint of trade," provides:

(a) Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in this State shall be unlawful.

(b) Without limiting the effect of subsection (a) of this section, the following shall

be deemed to restrain trade or commerce unreasonably and are unlawful:

(1) A contract, combination or conspiracy between two or more persons:

(A) For the purpose or with the effect of fixing, controlling, or maintaining the market price, rate or fee of any commodity or service; or

(B) Fixing, controlling, maintaining, limiting or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect of fixing, controlling or maintaining the market price, rate or fee of the commodity or service; or

(C) Allocating or dividing customers or markets, functional or geographic, for any commodity or service.

(2) A contract, combination or conspiracy between two or more persons whereby, in the letting of any public or private contract:

(A) The price quotation of any bid is fixed or controlled; or

(B) One or more persons submits a bid intending it to be higher than another bid and thus complementary thereto, submits a bid intending it to be substantially identical to another bid, or refrains from the submission of a bid.

(3) A contract, combination or conspiracy between two or more persons refusing to deal with any other person or persons for the purpose of effecting any of the acts described in subdivisions (1) and (2) of this subsection.

According to Appellants, the provisions of W. Va.Code § 47–18–3(b) deem contracts which fix prices, allocate markets or create exclusive dealing to be *per se* illegal. Additionally, Appellants contend that W. Va.C.S.R. § 142–15–3.1, which provides:

[i]t shall be unlawful under W. Va.Code §§ 47–18–3, 4 for any person or group of persons to enter into tie-in agreements.

---

4. In undertaking this analysis it is significant to remember that the exclusive contracts at issue herein where entered *prior to* this Court's determination that Monongalia General could not enter into exclusive contracts due to its status as a quasi-public hospital.

Such agreements include, but are not limited to, agreements which condition or have the effect of conditioning the sale of one product or service upon the purchase of another product or service[,]

creates another category of practices, i.e., tying arrangements, which are *per se* illegal under West Virginia law. Relying upon the argued *per se* designation, Appellants maintain that they are not required to undergo a market analysis to proceed with their claims. Pursuant to this argument, Appellants need only point to contractual provisions which fix prices, allocate anesthesia services at Monongalia General to a particular provider and/or demonstrate an agreement to deal exclusively in order to prevail.

Appellants argue that Monongalia General's contracts with BAC and PAS constitute market allocation and exclusive dealings because they limit the persons who may provide surgical anesthesia services at the hospital. Further, the contracts constitute tying arrangements, according to Appellants, because they tie the availability of surgical procedures at Monongalia General to specific anesthesia providers. Finally, Appellants argue that the contracts at issue constitute price fixing due to specific contractual provisions regarding the fees BAC and PAS will charge for anesthesia services performed. The provision in the BAC contract relied upon by Appellants states:

5.1–1 *Schedule(s) of Contractor Charges.* Contractor will establish schedule of fees, which fees shall be reasonable in light of those fees prevailing in the Hospital's service area, to be charged to all third party payors and patients for Orthopedic Anesthesiology Services to Patients by Contractor. The fees charged by Contractor on the date of this Agreement shall be the initial schedule of fees for the Contractor. If at any time during the term of this Agreement Contractor desires to revise its schedule of fees, it shall provide Hospital with written notice of its proposed schedule of fees, which notice shall specify the date (at least 45 days after the date of delivery of the notice) on which the new fees are to come into effect. . . .

This contractual provision continues to provide a procedure for Monongalia General to object to the proposed fee change. The BAC contract requires BAC to bill patients separately for its services and to be responsible for its own fee collections. Further, the contract provides that Monongalia General will not compensate BAC for the services provided to patients in the hospital. Similarly, the fee provision in the PAS contract relied upon by Appellants states:

5.1–1 *Schedule(s) of Contractor Charges.* Contractor shall establish a schedule of fees representing Contractor's full compensations for professional services rendered by contractor to patients. Such schedule must, at all times, comply with the applicable laws, rules, regulations, and contractual arrangements with and between Contractor and third party payors. The fees set out therein must, at all times, be reasonable and competitive.

The PAS contract likewise provides that PAS will bill and collect separately for its services and is not entitled to additional compensation from Monongalia General.

Appellees counter that terms such as "price-fixing," "market allocation," "exclusive dealing" and "tying" are terms of art which, pursuant to West Virginia law, require a court to look to well-developed federal precedent to define. Appellees argue that conduct or agreements which constitute the *per se* violations outlined in W. Va.Code § 47–18–3(b) gain meaning by examination of federal court decisions defining *per se* violations of the Sherman Act. Further, Appellees argue that a legislative rule cannot create a *per se* violation which is not set forth within the WVATA where the WVATA enumerates certain *per se* violations.

After detailed analysis of the parties' arguments, the circuit court granted Appellee's motion for partial summary judgment finding that the Appellants' antitrust claims fail as a matter of law. This appeal followed. For the reasons set forth below, we agree that partial summary judgment was appropriate in this matter. Accordingly, we affirm the decision of the Circuit Court of Monongalia County finding Appellant's antitrust claims fail as a matter of law.

## II.

### STANDARD OF REVIEW

██ We begin by recognizing that the "[a]ppellate review of a partial summary judgment order is the same as that of a summary judgment order, which is *de novo*." Syllabus Point 1, *West Virginia Department of Transportation, Division of Highways v. Robertson*, 217 W.Va. 497, 618 S.E.2d 506 (2005). *See also* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) ("[a] circuit court's entry of summary judgment is reviewed *de novo*."). We will affirm the grant of summary judgment "if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syl. Pt. 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). However, to the extent this matter may be construed as presenting a question of statutory interpretation, the applicable standard of review is likewise *de novo*. Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on appeal is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.").

## III.

### DISCUSSION

In order to resolve the matter presented herein, we must resolve several legal issues. First, this Court must clarify the extent to which West Virginia courts should look to federal law for guidance in applying the provisions of the WVATA. Additionally, we will address Appellants' argument that a legislative rule may designate practices deemed to be violations of our antitrust laws when the same are not included within those practices specifically set forth within the enabling statute itself. Finally, once the appropriate legal standards are clarified, analysis of Appellants' claims in light of the same is required.

## A.

### Federal Law as Persuasive Authority

██ In their first assignment of error, Appellants contend that the circuit court erred in applying federal law when analyzing their claims. Pursuant to W. Va.Code § 47–18–16 (1978), the Legislature has directed that the WVATA "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes." Moreover, this Court held in Syllabus Point 2 of *Gray v. Marshall County Board of Education*, 179 W.Va. 282, 367 S.E.2d 751 (1988), that "[t]he courts of this state are directed by the legislature in *W. Va.Code*, 47–18–16 [1978] to apply the federal decisional law interpreting the Sherman Act, 15 U.S.C. § 1, to our own parallel antitrust statute, *W. Va. Code*, 47–18–3(a) [1978]." Appellants argue that because their claims are based upon subsection (b) of W. Va.Code § 47–18–3 and not subsection (a), federal decisional law is irrelevant. Indeed, this Court has noted that it is not bound to apply federal law in determining the scope of the WVATA where the federal and state provisions are not "comparable." *State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 188 W.Va. 501, 507, 425 S.E.2d 177, 183 (1992).

The distinction between subsections (a) and (b) of W. Va.Code § 47–18–3 is not as clear as Appellants would argue. As noted above, Appellants simply alleged "restraint of trade" in their complaint. Arguably, subsection (a) which provides that contracts "in restraint of trade or commerce" are deemed unlawful in this State is therefore relevant. In an effort to avoid reference to federal law, however, Appellants contend that their claims are based solely upon W. Va.Code § 47–18–3(b), which they deem as a codification of practices deemed to be *per se* restraints of trade without reference to either subsection (a) or federal law. Arguing that the Sherman Act does not codify similar *per se* practices deemed to restrain trade, Appellants maintain there is no "comparable" federal law to apply. After consideration of the status of federal law at the time the WVATA was enacted, we reject Appellants' comparability argument.

### i.

### Comparability of W. Va.Code § 14–18–3(b) to federal Sherman Act precedent

The crux of Appellants' argument is that the direction in W. Va.Code § 47–18–16 is to construe the WVATA "in harmony with ruling judicial interpretations of comparable federal antitrust statutes" applies only to those claims brought under W. Va.Code § 14–18–3(a) because it is that provision which corresponds to the Sherman Act. Specifically, Appellant's argue the only "comparable" federal antitrust statute is 15 U.S.C. § 1 (hereinafter "Section 1 of Sherman Act") which states:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1 (2004).[5] The primary distinction between W. Va.Code § 47–18–3(a) and Section 1 of the Sherman Act is that the West Virginia statute applies to contracts and conspiracies in restraint of trade "in this State" while the federal statute is applicable to contracts and conspiracies "in restraint of trade or commerce among the several States, or with foreign nations".[6]

5. Although Section 1 of the Sherman Act has been amended since the time that the WVATA was enacted, those amendments do not affect the substantive portion at issue herein, i.e., the first sentence, but, instead, impact the penalty provisions.

6. Appellants' argument that to construe the WVATA in harmony with federal law creates a redundancy pursuant to which the WVATA is superfluous for the federal act is easily dismissed under fundamental principles of federalism. The federal act may only apply to contracts which

The Sherman Act was initially enacted in 1890, eighty-eight years prior to the WVATA. In *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), the United States Supreme Court recognized that "Congress, . . ., did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition." *National Soc. of Prof. Eng.*, 435 U.S. at 688, 98 S.Ct. at 1363. Nearly a century of judicial precedent defining and interpreting the scope of Section 1 of the Sherman Act and conduct constituting a violation thereof was therefore available to the Legislature at the time the WVATA was enacted with its direction that it be construed in harmony with judicial interpretations of comparable federal antitrust statutes. This Court has long held that:

A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it was intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.

Syl. Pt. 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908). *See also*, Syl. Pt. 1, *State v. White*, 188 W.Va. 534, 425 S.E.2d 210 (1992) (same). Additionally, this Court has held:

impact interstate commerce, and, absent a finding that interstate commerce is affected, would not apply to contracts affecting solely state matters. While the federal government may enact legislation declaring certain contracts illegal if they tend to lessen competition and impact interstate commerce, a state is not precluded from legislating as to matters of public policy with reference to contracts in restraint of trade by virtue of its inherent police power. *Mathews Conveyer, Co. v. Palmer–Bee, Co.*, 135 F.2d 73, 82 (6th Cir.1943).

'[w]hen the Legislature enacts laws, it is presumed to be aware of all pertinent judgments rendered by the judicial branch. By borrowing terms of art in which are accumulated the legal tradition and meaning of centuries of practice, the Legislature presumably knows and adopts the cluster of ideas attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.' Syl. pt. 2, in part, *Stephen L.H. v. Sherry L.H.*, 195 W.Va. 384, 465 S.E.2d 841 (1995).

Syl. Pt. 3, *CB&T Operations Co., Inc. v. Tax Comm'r,* 211 W.Va. 198, 564 S.E.2d 408 (2002). In light of these decisions, we must presume that the Legislature knew the scope of federal antitrust law and the terms of art utilized therein at the time it enacted the WVATA and directed its construction in harmony with federal law. Therefore, it is appropriate to consider the status of federal law at the time the WVATA was enacted and determine whether the provisions of W. Va. Code § 47–18–3(b) evidenced an intent by the Legislature to depart from federal antitrust law, as Appellants argue, or whether the provisions of W. Va.Code § 47–18–3(b) are simply a codification of federal judicial decisions setting forth conduct deemed to be *per se* violations of Section 1 of the Sherman Act.

In *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), the United States Supreme Court explained the development of law, including *per se* restrictions, under Section 1 of the Sherman Act as follows:

On its face, § 1 of the Sherman Act appears to bar any combination of entrepreneurs so long as it is "in restraint of trade." Theoretically, all manufacturers, distributors, merchants, sellers, and buyers could be considered as potential competitors of each other. Were § 1 to be read in the narrowest possible way, any commercial contract could be deemed to violate it. The history underlying the for-

mulation of the antitrust laws led this Court to conclude, however, that Congress did not intend to prohibit all contracts, nor even all contracts that might in some insignificant degree or attenuated sense restrain trade or competition. In lieu of the narrowest possible reading of § 1, the Court adopted a "rule of reason" analysis for determining whether most business combinations or contracts violate the prohibitions of the Sherman Act. An analysis of the reasonableness of particular restraints includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption.

While the Court has utilized the "rule of reason" in evaluating the legality of most restraints alleged to be violative of the Sherman Act, it has also developed the doctrine that certain business relationships are *per se* violations of the Act without regard to a consideration of their reasonableness.

. . . . .

It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act. One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.

*Topco,* 405 U.S. at 606–8, 92 S.Ct. at 1133 (internal citations omitted). Discussing *per se* violations of Section 1 of the Sherman Act, the Supreme Court, has recognized that "practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." *Northern Pacific Railway Company v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.E.2d 545 (1958) (internal citations omitted).[7] Price-fixing under Section 1 of the

7. Noting the differing tests applicable to alleged *per se* activities and other violations of Section 1

of the Sherman Act, the Supreme Court has explained:

Sherman Act has been defined as "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce." *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). Illegal price-fixing involves the elimination of competition because the "power to fix prices, whether reasonably exercised or not, involves the power to control the market and to fix arbitrary and unreasonable prices." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 345, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982), *quoting United States v. Trenton Potteries Co.*, 273 U.S. 392, 397–8, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927). An agreement that "interfere[s] with the setting of price by free market forces" is deemed *per se* illegal. *United States v. Container Corp.*, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969).

Likewise, an "agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition" was recognized as a classic example of a *per se* Sherman Act violation. *Topco*, 405 U.S. at 608, 92 S.Ct. at 1133. Agreements to control bids submitted during the letting of a contract in an effort to control the price or diminish competition are also deemed *per se* violations. *Addyston Pipe and Steel Company v. United States*, 175 U.S. 211, 242–5 20 S.Ct. 96, 107–9, 44 L.Ed. 136 (1899) (an agreement between competitors to establish bids to be submitted for letting of a contract, permitting one party to obtain the minimum bid and the others to bid higher constitutes a violation of the Sherman Act); *National Soc. of Prof. Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (engineering association's canon of ethics that prohibits competitive bidding by its members constituted a *per*

se Sherman Act violation). In *Fashion Originators' Guild of America v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), the Supreme Court found an agreement which:

> narrows the outlets to which garment and textile manufacturers can sell and the sources from which retailers can buy; subjects all retailers and manufacturers who decline to comply with the Guild's program to an organized boycott; takes away the freedom of action of members by requiring each to reveal to the Guild the intimate details of their individual affairs; and has both as its necessary tendency and as its purpose and effect the direct suppression of competition from the sale of unregistered textiles and copied designs

to violate Section 1 of the Sherman Act. *Fashion Originators' Guild*, 312 U.S. at 465, 61 S.Ct. at 707 (internal citations omitted). As the Supreme Court further explained:

> Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality. Even when they operated to lower prices or temporarily to stimulate competition they were banned. For, as this Court [has] said such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.

*Klor's Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3

---

Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused. See generally *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Other combinations, such as mergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency and enabling it to compete more effectively. Accordingly,

such combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's-actual effect. See, *e.g., Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568, (1977); *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, (1918).

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984).

L.Ed.2d 741 (1959) (internal quotations and citations omitted).

As recognized above, the Legislature is presumed to have known the status of federal antitrust law at the time it enacted the WVATA and directed its construction in harmony therewith. After exhaustive examination and consideration of the United States Supreme Court Sherman Act cases cited above and their progeny, this Court believes that the Legislature intended to codify certain activities deemed under federal law to be *per se* violations of Section 1 of the Sherman Act as *per se* violations of the WVATA. This conclusion is reinforced by the two jurisdictions noted by the Appellants to have similar *per se* violation codifications.

In arguing that the *per se* provisions included in W. Va.Code § 47–18–3(b) should be applied without consideration of federal antitrust law, Appellants point to the inclusion of similar *per se* statutory violations codified in Illinois and Minnesota law. However, upon examination of Minnesota and Illinois law to determine the position of those jurisdictions upon the consideration of federal antitrust law in applying their statutory *per se* provision, this Court notes that both Illinois and Minnesota find federal antitrust law relevant and persuasive.

For example, Illinois has codified what are deemed to be *per se* violations of its antitrust law in 740 Ill.Comp.Stat. 10/3(1) (1982).[8] The bar committee notes accompanying this statutory enactment specifically acknowledge the relevance of federal law. Explaining the purpose of the *per se* statutory provisions, the Committee stated:

The basic prohibitions of the [antitrust] statute are found in Section 3. *Section 3(1) proscribes certain of the offenses which under federal law are termed "per se" offenses* and are commonly deemed to constitute the most serious restraints upon competition. To them, criminal as well as civil penalties are attached. The conduct proscribed by Section 3(1) is violative of the Act without regard to, and the courts need not examine, the competitive and economic purposes and consequences of such conduct.

Section 3(1) is expressly limited to agreements between two classes of persons: (a) those who are competitors and (b) those persons who, but for a prior agreement, would be competitors. This latter class includes agreements between persons who are not currently competitors, but were at some time in the past and subsequently agreed to cease competing. It also includes agreements not to compete between persons who have never been competitors, but who would have become competitors but for such an agreement.

In general, Section 3(1) is designed to reach the "hard core" conspiratorial offenses of price fixing, limitations on production, and allocation of markets or customers.

(Emphasis added). In *People v. Crawford Distributing Company*, 53 Ill.2d 332, 291 N.E.2d 648, 652 (1972), the Illinois Supreme Court noted that while not binding, "the Federal antitrust experience under the Sherman Act is applicable to questions arising under the Illinois Antitrust Act and can serve as a useful guide". *See also, Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 480 (7th Cir.1988), *cert. denied* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) (noting that where state antitrust law claims are based on statutory language which parallels the Sher-

---

8. This statute states, in pertinent part,

 § 3. Every person shall be deemed to have committed a violation of this Act who shall: (1) Make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person: a. for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or bought by the parties thereto, or the fee charged or paid for any service performed or received by the parties thereto;

 b. fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect stated in paragraph a. of subsection (1);
 c. allocating or dividing customers, territories, supplies, sales, or markets, functional or geographical, for any commodity or service[.]

man Act, the state law claims will fail where a Sherman Act claim also fails).

Further, in *State by Humphrey v. Alpine Air Products, Inc.*, 490 N.W.2d 888 (Minn.Ct. App.1992), *aff'd*, 500 N.W.2d 788 (Minn.1993), the Minnesota Court of Appeals noted that Minnesota's antitrust act[9] "codified the pre–1971 federal case law and follows the provisions of the Sherman Act to a significant degree." *Alpine Air*, 490 N.W.2d at 893 (internal citations omitted). Therein, the court recognized Minnesota's established practice of interpreting its antitrust law consistently with the construction given federal antitrust law by federal courts. *Id.* at 894. We tend to agree with the policy considerations outlined by the court in *Alpine Air* for such interpretation and construction wherein the Minnesota court explained:

> We believe policy considerations suggest following federal precedent for substantive offenses. Without uniform construction between state and federal antitrust laws, businesses will have a difficult time predicting the antitrust implications of their business decisions. Enforcement of state and federal antitrust laws will also be aided by a policy of uniform interpretation. Therefore we conclude Minnesota antitrust law should be interpreted consistently with federal court interpretations of the Sherman Act unless state law is clearly in conflict with federal law.

*Id.*

■ Having thoroughly examined the status of federal antitrust law at the time the

WVATA was enacted, of which the Legislature is presumed to have been aware, this Court finds that the Legislature intended to incorporate certain activities deemed by federal courts to be *per se* violations of Section 1 of the Sherman Act into West Virginia antitrust law. Just as W. Va.Code § 47–18–3(a) is comparable to Section 1 of the Sherman Act, W. Va.Code § 47–18–3(b) is comparable to federal court decisions defining activities deemed to be *per se* violations of Section 1 of the Sherman Act. As such, we now hold that consistent with those activities deemed by federal judicial interpretation to be *per se* violations of Section 1 of the Sherman Act, West Virginia Code § 47–18–3(b) (1978) codifies comparable activities as *per se* violations of West Virginia antitrust law. To the extent W. Va.Code § 47–18–3 (1978) utilizes terms which are deemed "terms of art" under federal antitrust law, the meanings attributed to such "terms of art" under federal antitrust law are incorporated into W. Va.Code § 47–18–3 (1978) absent contrary statutory definitions set forth in the West Virginia Antitrust Act.

ii.

### Construction of W. Va.Code § 47–18–3(b) in Harmony with Federal Antitrust law

■ Both W. Va.Code § 47–18–16 and this Court's decision in *Graley's* indicate that the WVATA should be construed liberally and in harmony with federal decisional law interpreting comparable federal antitrust law

---

9. We note that the Minnesota antitrust statutes at issue in *Alpine Air* are substantively identical to W. Va.Code § 47–18–3(a) and (b)(1). Minn.Stat. § 325D.51, at issue in *Alpine Air* provided "a contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade is unlawful." W. Va.Code § 47–18–3(a), by contrast includes the term "every" before contract and includes the phrase "in this State shall" in lieu of the term "is" in the Minnesota statute. Similarly, the statutory *per se* violations set forth in Minn.Stat. § 325D.53 at issue in *Alpine Air* were set forth in Subdivision 1 of that statute and state:

> Without limiting section 325D.51, the following shall be deemed to restrain trade or commerce unreasonably and are unlawful:
> (1) A contract, combination, or conspiracy between two or more persons in competition:

(a) for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price, rate, or fee of any commodity or service;
(b) affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service.

The only differences between this statutory provision and W. Va.Code § 47–18–3(b)(1)(A)(B), are the inclusion of the phrase "in competition" in the introductory language and the inclusion of the term "affecting" in subdivisions (a) and (b).

provisions. Having found that W. Va.Code § 47–18–3(b) is comparable to Section 1 of the Sherman Act, we must now determine the extent to which this Court is bound to apply federal decisional law relative to *per se* violations of Section 1 of the Sherman Act in determining the scope of activities constituting *per se* violations of the WVATA. While we acknowledge that the Legislature may indicate its intention that a statutory enactment be harmonized with federal law, fundamental principles of separations of powers [10] preclude the Legislature from requiring the courts of this State to construe or interpret a statutory enactment in a particular manner. Article VIII, Section 1 of our Constitution vests the judicial power of the State "solely in a supreme court of appeals and in the circuit courts, and in such intermediate appellate courts and magistrate courts as shall be hereafter established by the legislature, and in the justices, judges and magistrates of such courts." While the courts of this State may elect to "honor legislative enactments in aid of judicial power", we are "clearly not bound to do so." *State ex rel. Quelch v. Daugherty*, 172 W.Va. 422, 424, 306 S.E.2d 233, 235 (1983). The question therefore becomes, when should this Court depart from a direction [11] to look to federal law in interpreting or applying West Virginia law?

When presented with a recommendation from the Legislature to look to federal law in interpreting a statute or with our own precedent looking to federal law for guidance on a particular issue, several factors should guide our determination as to whether we should follow the federal courts' direction or whether we should determine that our interpretation of West Virginia law should be unique. For this consideration, a comparison of the specific language of the federal and state provisions at issue must be our primary starting point. A lack of significant distinctive language between the state and federal law at issue should dissuade this Court from proceeding in a distinctive manner. Thus, where there is no significant distinction in the wording of the federal and state provisions, this court should be guided by federal decisions interpreting or applying the same unless a compelling reason to depart from the federal guidance is demonstrated. Accordingly, the legislative histories of the specific provisions at issue are important factors for us to consider. For example, did our Legislature intend the West Virginia statute to correspond to federal law or to depart therefrom? Does the legislative enactment at issue contain terms of art or unique phrases which have gained accepted or uniform judicial interpretations or meanings? Are there differences in the extent and type of interests which the Federal and the West Virginia provisions are designed to protect? If so, a compelling reason to depart from federal precedent may arise.

■ Finding that the judges, lawyers, governmental actors and citizens of this State are entitled to guidance from this Court as to when courts should comply with or depart from a specific statutory direction from the Legislature to construe a particular statutory scheme in harmony with comparable federal statutes and judicial interpretations thereof, we now hold that the following factors are relevant to such a determination: (1) similarity of language between the federal and West Virginia enactments; (2) similarities or distinctions between federal and state precedent interpreting and/or applying the particular enactment; (3) whether the legis-

---

10. Article V, Section 1 of our Constitution provides, in relevant part:

 The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to the either of the others; nor shall any person exercise the powers of more than one of them at the same time[.]

11. Such direction may come from Legislative enactments or our own precedent. For example, in *State v. Andrews*, 91 W.Va. 720, 114 S.E. 257 (1922), this Court held "[t]he provisions of our constitution relating to unreasonable search and

seizure and protecting one accused of a crime from being compelled to a be a witness against himself, being substantially the same as the corresponding provisions of the federal constitution and taken therefrom, should be given a construction in harmony with the construction of federal provisions by the Supreme Court of the United States." Syl. Pt. 2, *Andrews*. *See also, State v. Duvernoy*, 156 W.Va. 578, 582, 195 S.E.2d 631, 634 (1973) ("this Court has traditionally construed Article III, Section 6 in harmony with the Fourth Amendment.")

lative history of the West Virginia enactment evidenced an intent to follow federal law and precedent; (4) the use of terms of art or unique phrases which have gained accepted or uniform judicial interpretations or meanings; (5) the competing or similar interests the federal and state enactments were designed to protect; (6) whether harmonization of federal and state law will facilitate significant policy interests; and (7) such other factors as may serve as compelling considerations under the circumstances presented.

██ Applying these factors to the instant matter, we find no reason to depart from federal precedent when analyzing the viability of Appellants' claims. Appellants do not dispute that W. Va.Code § 47–18–3(a) is comparable to federal antitrust statutes, specifically Section 1 of the Sherman Act and we have held herein that W. Va.Code § 47–18–3(b) is likewise comparable in light of the federal jurisprudence construing Section 1 of the Sherman Act. Our own lack of substantial precedent involving the WVATA favors looking to federal law for guidance in applying and construing these comparable statutes. Further, the Legislature specifically evidenced an intent that the WVATA be harmonized to comparable federal antitrust law through its inclusion of W. Va.Code § 47–18–16 in the statutory scheme. Similarly, the Legislature utilized terms of art in this statutory scheme, terms which have gained wide-

spread meaning and acceptance through the development of federal antitrust law. Both the WVATA and Sherman Act appear designed to protect and promote a similar interest—competition in the marketplace. While federal and state law may overlap, incidents may arise where state law would apply when federal law would not, such as where interstate commerce is not effected. Further, we find the policy reasons set forth by the court in *Alpine Air, supra,* for the harmonization of federal and state antitrust law to be particularly persuasive. Finally, Appellants have put forth no compelling argument which would persuade this Court to depart from the guidance provided by federal law and we have failed to discover such a reason on our own. Accordingly, we find that Appellants' claims should be analyzed under the guidance provided by federal law, including federal application of *per se* antitrust rules.

### B.

### W. Va.C.S.R. § 142–15–3

Prior to examining Appellants' individual claims to determine whether they qualify as *per se* violations of W. Va.Code § 47–18–3(b), we must briefly address Appellants' argument that a legislative rule, specifically W. Va.C.S.R. § 142–15–3, designates another activity, "tying" [12], as a *per se* violation of West

---

**12.** In *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), abrogated in part by statute as recognized in *Illinois Tool Works, Inc. v. Independent Ink, Inc.,* 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006) (*Illinois Tool* found statutory changes necessitated conclusion that fact a tying product is patented does not support presumption of market power), the United States Supreme Court addressed the concept of "tying" under federal antitrust law in a case strikingly similar to the instant action as it involved a hospital's exclusive contract with an anesthesia provider. Therein the Supreme Court recognized that their:

cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the

merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. at 1558. The Supreme Court went on to note that tying arrangements are condemned "when the seller has some special ability—usually called "market power" to force a purchaser to do something that he would not do in a competitive market." Further, "Per se condemnation-condemnation without inquiry into actual market conditions-is only appropriate if the existence of forcing is probable.... as a threshold matter there must be a substantial potential for impact on competition in order to justify per se condemnation." *Id.* at 15–16, 104 S.Ct. at 1560. "Tying" arrangements are not condemned "unless a substantial volume of commerce is foreclosed thereby." *Id.* Finding the relevant market to be the geographical area and not the specific hospital, the Supreme Court upheld the contract against charges of antitrust violations.

In *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1971), the Ninth Circuit Court of Ap-

Virginia antitrust law. Relying upon this Court's decision in *West Virginia Health Care Cost Review Authority v. Boone Memorial Hospital,* 196 W.Va. 326, 472 S.E.2d 411 (1996), Appellants argue that, as a legislative rule, W. Va.C.S.R. § 142–15–3 has the force and effect of statutory law and, being enacted after W. Va.Code § 47–18–3, "prevails as the most recent expression of the legislative will" even if it is deemed to be in conflict with W. Va.Code § 47–18–3. We disagree with such an expansive interpretation of our decision in *Boone Memorial.*

 Recently, this court reiterated that a legislative rule can be deemed "unenforceable if the regulation was beyond the constitutional or statutory authority extended to the agency involved or if the rule is determined to be arbitrary or capricious." *Swiger v. UGI/AmeriGas, Inc.,* 216 W.Va. 756, 763, 613 S.E.2d 904, 911 (2005), *citing* Syl. Pt. 4, *Appalachian Power Co. v. State Tax Department,* 195 W.Va. 573, 466 S.E.2d 424 (1995). Similarly, we held in Syllabus Point 2 of *Boone Memorial* that:

> Once a disputed regulation in legislatively approved, it has the force of a statute itself. Being an act of the West Virginia Legislature, it is entitled to more than mere deference; it is entitled to controlling weight. As authorized by legislation, a legislative rule should be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious.

Accordingly, to the extent the agency has exceeded its constitutional or statutory authority in promulgating a legislatively approved rule or regulation, the legislative rule "should be ignored." Syl. Pt. 2, *Boone Memorial.* Thus, the first question which must be answered is what, if any, authority the Attorney General had to enact the legislative rule at issue herein, which Appellants argue deems "tying" to be a *per se* violation of West Virginia antitrust law.

The Attorney General's authority to enact rules and regulations applicable to West Virginia antitrust law is set forth in W. Va.Code § 47–18–20 (1978), which provides that "[t]he attorney general may make and adopt such rules and regulations as may be necessary for the enforcement and administration of this Article." Thus, we must consider whether the designation of "tying" as an "unlawful" activity in W. Va.C.S.R. § 142–15–3 is necessary to the enforcement and administration of W. Va.Code §§ 47–18–3, 4, (the statutes cited within the rule itself); *i.e.,* whether it clarifies or gives meaning to the specific statutory provisions or whether it conflicts with them.

In *Repass v. Workers' Compensation Division,* 212 W.Va. 86, 569 S.E.2d 162 (2002), this Court addressed a challenge to a rule[13] arguably at odds with our workers' compensation statutes. In *Repass* we explained:

> There is no question that when the rules of an agency come into conflict with a statute that the statute must control:
>
>> Any rules or regulations drafted by an agency must faithfully reflect the intention of the Legislature, as expressed in the controlling legislation. Where a statute contains clear and unambiguous

---

peals summarized the concept of "tying" under the Sherman Act as follows:

> In order to establish that there exists an unlawful tying arrangement plaintiffs must demonstrate *First,* that the scheme in question involves two distinct items and provides that one (the tying product) may not be obtained unless the other (the tied product) is also purchased. *Second,* that the tying product possesses sufficient economic power appreciably to restrain competition in the tied product market. *Third,* that a "not insubstantial" amount of commerce is affected by the arrangement.

*Siegel,* 448 F.2d at 47 (internal citations omitted). The Ninth Circuit went on to note that "[u]nder the per se theory of illegality, plaintiffs are required to establish not only the existence of a tying arrangement but also that the tying product

possesses sufficient economic power to appreciably restrain free competition in the tied product markets." *Id.* at 49.

**13.** In footnote 7 of the majority opinion in *Repass,* the Court acknowledged that there was a dispute as to whether or not the rule at issue was a legislative rule. The Court noted, however, that even if the rule had the "authority of a legislative rule, the deference we owe does not change. Even when considering a legislative rule, under *Appalachian Power Co. v. State Tax Department of West Virginia,* 195 W.Va. 573, 466 S.E.2d 424 (1995), and its progeny, when a statute is clear, we owe no deference to the agency's rule."

language, an agency's rules or regulations must give that language the same clear and unambiguous force and effect that the language commands in the statute.

Or in other words: "Although an agency may have power to promulgate rules and regulations, the rules and regulations must be reasonable and conform to the laws enacted by the Legislature."

The power of the Legislature is paramount when a court is faced with a conflict between a statute and a rule:

It is fundamental law that Legislature [sic] may delegate to an administrative agency power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority.

Though the courts have the power to harmonize a rule with an ambiguous statute, we must follow the will of the Legislature when expressed with clarity. "The judiciary is the final authority on issues of statutory construction, and we are obliged to reject administrative constructions that are contrary to the clear language of a statute."

...in those instances where an agency rule addresses some issue that is already the subject of Legislative action, "[i]f the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent."

*Repass,* 212 W.Va. at 102–03, 569 S.E.2d at 178–9 (internal citations and footnote omitted)

▆▆▆ The clarity of legislative intent when enacting a statute is a primary consideration in determining the significance with attaches to a legislative rule promulgated thereunder. This Court has recognized that it must reject administrative "rules that are contrary to legislative intent." *Boone Memorial,* 196 W.Va. at 335, 472 S.E.2d at 420. In *Boone*

*Memorial,* this Court explained the initial analysis to be undertaken, stating:

Judicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference. In deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The court first must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage. Syllabus Point 3, *Appalachian Power Co. v. State Tax Department of West Virginia,* 195 W.Va. 573, 466 S.E.2d 424 (1995).

Syl. Pt. 4, *Boone Memorial.* In *Boone Memorial,* this Court stated that it will "defer to an agency's reasonable interpretation of a statute it administers unless the intent of the statute is clear. In other words, we are obligated to defer to an agency's view only when there is a statutory gap or ambiguity." *Boone Memorial,* 196 W.Va. at 337, 472 S.E.2d at 422. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based upon a permissible construction of the statute." *Id., quoting,* Syl. Pt. 4, *Appalachian Power.*

▆▆▆ As noted above, the Legislature has specifically designated certain activities as "unlawful" restraints of trade under our antitrust laws in W. Va.Code § 47–18–3(b).[14] Those activities include price-fixing, market allocation, bid-fixing and exclusive dealing as activities which have been defined under federal antitrust law as *per se* restraints of trade. Tying, however, is a concept distinct from those activities set forth in W. Va.Code § 47–18–3(b). By specifically setting forth

**14.** We limit our analysis of W. Va.C.S.R. § 142–15–3 herein to its relationship with W. Va.Code § 47–18–3 as W. Va.Code § 47–18–4 (1978) is not at issue in this litigation.

in W. Va.Code § 47–18–3(b) those activities it intended to constitute *per se* restraints of trade, the Legislature triggered use of a fundamental principle of statutory construction, being *expressio unius est exclusio alterius*. *See,* Syl. Pt. 3, *Manchin v. Dunfee,* 174 W.Va. 532, 327 S.E.2d 710 (1984) ("In the interpretation of statutory provisions, the familiar maxim *expressio unius est exclusio alterius,* the express mention of one thing implies the exclusion of another, applies"). Absent ambiguity in the enabling statute or the need to clarify what activities constitute the *per se* violations set forth in W. Va.Code § 47–18–3(b), a legislative rule may not establish another category of *per se* violations. The legislative rule relied upon by Appellants, W. Va.C.S.R. § 142–15–3, may not reasonably be seen as an attempt to give meaning or clarify conduct satisfying the requirements of W. Va.Code § 47–18–3(b).[15] As such, Appellants' "tying" allegations are insufficient as a matter of law to establish a violation of our antitrust laws because "tying" is not a statutory *per se* violation.[16]

### C.

### Propriety of Partial Summary Judgment

Having found that Appellants' allegations of *per se* restraints of trade must be analyzed in reference to definitions and tests developed under federal law, the Circuit Court of Monongalia County's order granting Appellees' motion for partial summary judgment is easily affirmed. Relying exclusively upon their position that federal antitrust law is irrelevant to their claims, Appellants have not explained how their claims constitute price-fixing, market allocation and refusal to deal. However, as we have found, federal law is relevant to give meaning to our antitrust law.

 According to Appellants, the contracts between Monongalia General, PAS and BAC constitute *per se* violations of W. Va. Code § 47–18–3(b)(1)(A) because they contain terms setting prices and a market analysis is not required. The price provisions of the contracts at issue, quoted above, do not set forth specific prices, but simply required PAS and BAC to set "reasonable" prices in light of the prevailing and competitive market rates. Illegal price-fixing requires more. It requires a power to control the market and fix arbitrary prices, including an interference with the setting of prices by market forces. *See, Socony–Vacuum,* 310 U.S. at 223, 60 S.Ct. at 844; *Maricopa County Medical Society,* 457 U.S. at 345, 102 S.Ct. at 2473; and *Container Corp.,* 393 U.S. at 337, 89 S.Ct. at 512. Simply requiring a contractor to set reasonable prices in accordance with prevailing market rates is insufficient as a matter of West Virginia law to establish a violation of our antitrust law. Accordingly, to the extent Appellants rely upon a theory of *per se* price-fixing to establish their claims, their claims were properly dismissed by the circuit court.

 Similarly, Appellants' market allocation theory fails as a matter of law. Appellants argue that the relevant market is the hospital itself. According to Appellants, the contracts allocate the provision of anesthesia services at the hospital, thus constituting *per se* violations of W. Va.Code § 47–18–3(b)(1)(C). However, such a narrow definition of "market" was rejected by the United States Supreme Court in *Jefferson Parish, supra.* Additionally, federal antitrust law clearly defines illegal market allocation as the division of territories by competitors at the same level of the market structure to minimize competition. *See Topco,* 405 U.S. at 608, 92 S.Ct. at 1133. Because there is no agreement by competitors to allocate a market, Appellants' claims based upon a theory of market allocation fail as a matter of law.

---

**15.** If W. Va.C.S.R. § 142–15–3 could reasonably be deemed an attempt to clarify ambiguity in W. Va.Code § 47–18–3(b), then ordinary canons of statutory construction may be used to attempt to resolve any apparent conflict between the legislative rule and the initial statute. *See* Syl. Pt. 3, *Boone Memorial.*

**16.** Even if this Court were to have recognized "tying" as a type of *per se* violation of our antitrust law, the allegations herein are insufficient to trigger such *per se* status as that status has developed under federal law. *See* note 12, *supra.*

■ Finally, because their price-fixing and market allocation claims fail as a matter of law, Appellants' refusal to deal claims likewise also fail. An illegal refusal to deal under W. Va.Code § 47–18–3(b)(3), is statutorily defined by reference to activities violating W. Va.Code § 47–18–3(b)(1) or (2). Because we have found that Appellants' claims under W. Va.Code § 47–18–3(b)(1) fail as a matter of law and that no claims have been properly asserted under W. Va.Code § 47–18–3(b)(2), Appellants' claims for violation of W. Va.Code § 47–18–3(b)(3) must also fail. Accordingly, summary judgment as to all of Appellants' antitrust claims was appropriate.

## IV.

## CONCLUSION

The Circuit Court of Monongalia County did not err in looking to federal law to give meaning to the state antitrust claims asserted by Appellants against Monongalia General, PAS and BAC herein. W. Va.Code § 47–18–3(b) sets forth activities constituting *per se* violations of our antitrust law which are comparable to those activities deemed to be *per se* violations of federal antitrust statutes, thereby triggering an analysis of the same in harmony with federal law. The allegations asserted in the instant action do not meet the legal threshold of *per se* antitrust violations. Appellants admit that their position on appeal is founded solely upon this Court's determination that their claims constitute *per se* violations of West Virginia law. They do not. Accordingly, we affirm the Circuit Court of Monongalia County's grant of partial summary judgment as to all antitrust claims asserted in this civil action.

Affirmed.

STARCHER, J., dissenting:

(Filed June 29, 2007)

The main issue in this case was whether the circuit court was bound to apply federal antitrust precedents to the appellants' case, when the circuit court was interpreting West Virginia antitrust statutes that were markedly different from the federal antitrust statutes.

I dissent because I think the question answers itself: because West Virginia's statutes are different from the federal statutes, then the Legislature must have intended for our statutes to have a different interpretation and reach than the federal statutes. That means that federal antitrust cases shouldn't be relied upon as binding authority by West Virginia courts.

The majority opinion holds otherwise, and in its interpretation of the West Virginia antitrust statutes at issue, almost exclusively parrots federal cases interpreting federal antitrust law. I believe this was a mistake, for several reasons.

First, this Court is duty-bound to operate independently of federal courts, and should not view federal court decisions as a sacred script to be followed by faith and not reason. We made clear in Syllabus Point 3 of *Brooks v. Isinghood*, 213 W.Va. 675, 584 S.E.2d 531 (2003) that "[a] federal case interpreting a federal counterpart to a West Virginia rule ... may be persuasive, but it is not binding or controlling." The Court in *Brooks*—interpreting a state *Rule of Civil Procedure* that paralleled the *Federal Rules of Civil Procedure*—unanimously reasoned that the Court should avoid having our legal analysis of West Virginia law "amount to nothing more than Pavlovian responses to federal decisional law." 213 W.Va. at 675, 584 S.E.2d at 531. Likewise, in *Stone v. St. Joseph's Hosp. of Parkersburg*, 208 W.Va. 91, 538 S.E.2d 389 (2000), this Court recognized that the West Virginia Human Rights Act mirrored federal civil rights statutes in many ways. Still, the Court went on to find that the Act, "as created by our Legislature and as applied by our courts and administrative agencies, represents an independent approach to the law of disability discrimination that is not mechanically tied to federal disability discrimination jurisprudence." 208 W.Va. at 106, 538 S.E.2d at 404.

Second, *W.Va.Code*, 47–18–16 [1978] says that the West Virginia Antitrust Act is to be (a) "construed liberally" and (b) construed "in harmony with ruling judicial interpretations of comparable federal antitrust statutes." The Legislature didn't say West Virginia courts were supposed to mimic federal

courts. West Virginia courts are to harmonize their rulings with federal rulings when the case involves a "comparable federal antitrust statute[ ]," but do so in a way that liberally and generously accomplishes the remedial goals of the West Virginia Antitrust Act. And if there is no comparable federal antitrust statute, then courts are to construe the Act "liberally." Period. This Court is under no duty to apply federal case law in determining the scope of the Act where the federal and state statutes are not "comparable." *See State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 188 W.Va. 501, 507 n. 1, 425 S.E.2d 177, 183 n. 1 (1992) ("[A] violation of West Virginia's Antitrust Act may not necessarily give rise to a violation of the federal antitrust laws.")

The majority opinion, however, resigns this Court to being a sock puppet for the federal judiciary, regardless of whether the federal antitrust statute is comparable to West Virginia's antitrust statute.

The federal antitrust statute, the Sherman Act, is written in very general terms. The federal statute declares broadly that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the various States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

The first half of the West Virginia Antitrust Act mirrors the federal statute. *W.Va. Code*, 47–18–3(a) [1978] states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in this State shall be unlawful." Clearly, without question, *W. Va.Code*, 47–18–16 is a legislative mandate that *W. Va. Code*, 47–18–3(a) be interpreted in harmony with federal cases interpreting 15 U.S.C. § 1, because the two statutes are not just "comparable," they are virtually identical.

But the second half of the West Virginia Antitrust Act is found nowhere in the federal antitrust statutes. *W. Va.Code*, 47–18–3(b) lays out various actions that are defined as *per se* restraints on trade or commerce. Further, other *per se* violations are listed in legislative rules enacted by the Legislature, violations which have no corollary in federal

antitrust statutes. *See* 142 C.S.R. § 15.3.1. These provisions were designed by the Legislature to make West Virginia's antitrust law different from federal law. Different means that the statutes are not "comparable."

The majority opinion, however, ignores the mandate of *W. Va.Code*, 47–18–16, which talks only about "comparable federal antitrust *statutes.*" The majority opinion hinges upon the fact that there was "federal antitrust *law,*" in the form of federal court decisions interpreting the Sherman Act, at the time the Legislature enacted *W. Va.Code*, 47–18–3(b). Again and again, the majority opinion talks about "the development of *law* . . . under Section 1 of the Sherman Act," the "status of federal *law* at the time the WVATA was enacted," and "the status of federal antitrust *law* at the time [the Legislature] enacted the WVATA."

The end result is that the majority opinion re-interprets the phrase "federal antitrust statutes" in *W. Va.Code*, 47–18–16 to mean "federal court cases interpreting federal antitrust statutes."

This plainly was not what the Legislature meant when it adopted the West Virginia Antitrust Act. The Legislature created *per se* categories of restraints of trade and commerce in *W. Va.Code*, 47–18–3(b), categories that are not found in any federal statute. Accordingly, these categories should be liberally construed to accomplish the goal of free trade and commerce in West Virginia. There might be a federal court case or two that could offer persuasive reasoning to assist in interpreting *W. Va.Code*, 47–18–3(b). Instead, the majority opinion has decided not to interpret West Virginia's law, but rather has chosen to mechanically tie up and cripple the effect of the West Virginia Antitrust Act with federal decisional jurisprudence.

I therefore respectfully dissent.